**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* | ) | |
| | ) | |
| JOHN N. KRAMER, D.D.S., | ) | Case No.: 1:18-CV-00373-DRC |
| | ) | |
| BRINGING THIS ACTION ON BEHALF | ) | Judge: Hon. Douglas R. Cole |
| OF THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff and Relator,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT A. DOYLE, JR. D.M.D., *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

**REPLY IN SUPPORT OF DEFENDANTS NORTH AMERICAN DENTAL GROUP, LLC**
**AND NORTH AMERICAN DENTAL MANAGEMENT, LLC'S MOTION TO DISMISS**

Dated: February 6, 2020

Andrew G. Fiorella (0077005)
James J. Walsh, Jr. (0096660) (*pro hac vice*)
**BENESCH, FRIEDLANDER,**
**COPLAN & ARONOFF LLP**
200 Public Square, Suite 2300
Cleveland, Ohio 44114
Telephone: (216) 363-4500
Facsimile: (216) 363-4588
E-Mail: afiorella@beneschlaw.com
jwalsh@beneschlaw.com

Mark J. Silberman (*pro hac vice*)
Stephen Chahn Lee (*pro hac vice*)
71 South Wacker Drive, Suite 1600
Chicago, Illinois 60606
Telephone: (312) 212-4949
Facsimile: (312) 767-9192
E-Mail: msilberman@beneschlaw.com
slee@beneschlaw.com

*Attorneys for Defendants North American*
*Dental Group, LLC and North American*
*Dental Management, LLC*

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ...................................................................................... 1

II.    Doyle's Fourth Attempt to Plead A Claim Should Be Dismissed ...................................... 1

     A.    The TAC Does Not And Cannot Allege That NADG Participated in a Scheme ............................................................................................... 1

          1.    The TAC Fails to Allege NADG Caused Submission Of A False Claim ...................................................................................2

          2.    The "Who, What, When," Highlights The TAC's Deficiency ...................7

          3.    The TAC Does Not Allege That NADG "Enlarged" A Scheme ................8

     B.    Dr. Kramer Concedes That NADG Did Not Control Clinical Decisions ............ 10

          1.    Differences In Medical Opinion Are Not Actionable Under The FCA ...................................................................................14

          2.    NADG Cannot Be Liable As A Corporate Successor ..............................16

     C.    Dr. Kramer's Most Recent Amendments Did Not Add Material Allegations ..................................................................................... 18

     D.    Dr. Kramer's Fourth Attempt To Plead Should Be Dismissed With Prejudice ..................................................................................... 18

III.    CONCLUSION....................................................................................... 20

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Begala v. PNC Bank, Ohio, N.A.*,
    214 F.3d 776 (6th Cir. 2000) ........................................................................19, 20

*CNH Am. LLC v. UAW*,
    645 F.3d 785 (6th Cir. 2011) ...............................................................................19

*Crosby v. Twitter, Inc.*,
    921 F.3d 617 (6th Cir. 2019) ...............................................................................20

*Culy Constr. & Excavating, Inc. v. Laney Directional Drilling Co.*,
    No. 2:12-CV-4, 2012 WL 12942602 (S.D. Ohio Aug. 13, 2012) .........................19

*Forman v. Meridian Bioscience, Inc.*,
    367 F. Supp. 3d 674 (S.D. Ohio 2019) .................................................................17

*Graham v. Fearon*,
    721 F. App'x 429 (6th Cir. 2018) .........................................................................19

*IBC Mfg. Co. v. Velsicol Chemical Corp.*,
    187 F.3d 635 (6th Cir. 1999) .........................................................................16, 17

*Johnson v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*,
    502 F. App'x 523 (6th Cir. 2012) .........................................................................13

*In re Porsche Cars N. Am., Inc.*,
    880 F. Supp. 2d 801 (S.D. Ohio 2012) ...........................................................19, 20

*PR Diamonds, Inc. v. Chandler*,
    91 F. App'x 418 (6th Cir. 2004) ...........................................................................19

*RLFShop, LLC v. Am. Express Co.*,
    No. 3:17-CV-405, 2019 WL 499835 (S.D. Ohio Feb. 8, 2019) ............................13

*Sanderson v. HCA-The Healthcare Company*,
    447 F.3d 873 (6th Cir. 2006) ........................................................................2, 7, 10

*U.S. ex rel. Bledsoe v. Community Health Sys., Inc.*,
    501 F.3d 493 (6th Cir. 2007) ............................................................................2, 4

*U.S. ex rel. Bunk v. Government Logistics N.V.*,
    842 F.3d 261 (4th Cir. 2016) ...............................................................................16

*U.S. ex rel. Harper v. Muskingum Watershed Conservancy Dist.*,
842 F.3d 430 (6th Cir. 2016) ........................................................................9, 14, 16

*U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.*,
532 F.3d 496 (6th Cir. 2008) .............................................................................2

*U.S. v. AseraCare, Inc.*,
938 F.3d 1278 (11th Cir. 2019) .........................................................................14

*U.S. v. Fazzi Assocs., Inc.*,
No. 1:15-CV-511, 2019 WL 6117299 (S.D. Ohio Nov. 18, 2019) ......................3, 6

*U.S. v. Paulus*,
894 F.3d 267 (6th Cir. 2018) .............................................................................15

*United States ex rel. Martin v. Life Care Ctrs. of Am., Inc.*,
No. 1:08-CV-251, 2014 WL 11429265 (E.D. Tenn. Mar. 26, 2014) ............................ *passim*

*United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*,
838 F.3d 750 (6th Cir. 2016) ............................................................................ *passim*

*United States ex rel. Roycroft v. Geo Grp., Inc.*,
722 F. App'x 404 (6th Cir. 2018) .......................................................................18

*Welco Indus., Inc. v. Applied Cos.*,
67 Ohio St. 3d 344 (1993) ...........................................................................16, 17

**Statutes**

False Claims Act, 31 U.S.C. Section 3729 *et seq.* .........................................................12

**Other Authorities**

Fed. R. Civ. P. 7(a) ................................................................................................14

Fed. R. Civ. P. 9(b) ............................................................................................. *passim*

Fed. R. Civ. P. 12(b)(6).............................................................................................19

Jackie Best Crowe, *ODA researching new benefits to support dental offices,*
*including in-office dental plan and group buying arrangement*, OHIO DENTAL
ASSOCIATION (June 7, 2019) https://www.oda.org/news/detail.dT/oda-
researching-new-benefits-to-support-dental-offices-including-in-office-dental-
plan-and-group-buying-arrangement/?fullsite ...........................................................5

## I.    INTRODUCTION

Relator Dr. Kramer's Opposition demonstrates that his Third Amended Complaint ("TAC") has not alleged, and cannot allege, a plausible claim against North American Dental Group,[1] much less one that satisfies the rigorous standards of Rule 9(b).  As an initial matter, after thirty-seven pages of briefing, Dr. Kramer—a direct competitor of Dr. Doyle and the CDC Entities—cannot point to a single FCA case arising under similar circumstances.

For at least three reasons, in addition to those in NADG's Motion, the Opposition shows that the TAC should be dismissed.  *First*, Dr. Kramer alleges no facts regarding NADG's participation in the scheme, including in submitting or causing the submission of false claims. *Second*, Dr. Kramer concedes that NADG had no control over the clinical decisions at issue. And, *third*, Dr. Kramer's TAC added no material allegations, and his request to amend again is improper.  Consequently, the Court should dismiss with prejudice the claims against NADG.

## II.    DOYLE'S FOURTH ATTEMPT TO PLEAD A CLAIM SHOULD BE DISMISSED

### A.    The TAC Does Not And Cannot Allege That NADG Participated in a Scheme

Dr. Kramer's theory of NADG's participation in the alleged scheme rests on a single unsupported inference:  that NADG must have known "that Complete Dental Care's revenue . . . could not be achieved without continuing Doyle's" scheme, because it "looks [to partner] with practices 'that generate 750k in revenue or more.'"  (TAC, Dkt. 37 ¶¶ 36–37.)  In his Opposition, Dr. Kramer repeatedly argues that NADG is complicit in the alleged scheme because it somehow "knew CDC's financials were unrealistic, acquired an interest in them anyway, and rather than stopping the scheme, continued it."  (Dr. Kramer's Opposition, Dkt. 54, PAGEID 637; *see also id.* PAGEID 639.)  But Dr. Kramer does not plead any facts connecting the dots between

---

[1]    Unless otherwise noted, NADG incorporates by reference all defined terms used in its Motion and Memorandum in Support, including that NADG and NADM are referred to collectively as "NADG." (*See* Dkt. 49.)

NADG's alleged threshold for acquisition targets and its awareness or continuation of the alleged scheme. Even if "'knowledge of the false claim need only be 'alleged generally'" (Dkt. 54, PAGEID 624), Dr. Kramer still has to "plead[] sufficient detail—in terms of time, place, and content, [and] the nature of a defendant's fraudulent scheme." *U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008). Dr. Kramer has not only failed to allege sufficient detail about NADG's participation in the alleged scheme—he has not alleged ***any*** detail at all.

### 1. The TAC Fails to Allege NADG Caused Submission Of A False Claim

Dr. Kramer has done nothing to plead "an actual false claim with particularity," which "is an indispensable element of a complaint that alleges a FCA violation." *U.S. ex rel. Bledsoe v. Community Health Sys., Inc.*, 501 F.3d 493, 504 (6th Cir. 2007) ("*Bledsoe II*"). Dr. Kramer "alleges NADG caused the submission of false claims for Patients 6 and 7." (Dkt. 54, PAGEID 629.) Dr. Kramer fails to allege any facts, however, supporting that assertion. Instead, Dr. Kramer's conclusory statement suggests that "illegal payments must have been submitted, were likely submitted or should have been submitted." *Sanderson v. HCA-The Healthcare Company*, 447 F.3d 873, 877 (6th Cir. 2006) (citation omitted). That type of unsupported conclusion is insufficient to state a claim under the FCA. *Id.*

By relying on *United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 838 F.3d 750 (6th Cir. 2016), Dr. Kramer concedes that he has not "sufficiently allege[d] the submission of" a false claim, as to NADG. *Id.* at 769. Dr. Kramer argues that he only has to "identify <u>a representative false claim</u> that was actually submitted or plead facts which support a strong inference that a claim was submitted." (Dkt. 54, PAGEID 624 (internal quotation marks omitted) (emphasis in original).) But *Prather* announced an ***exception*** to the general rule, a fact which Dr. Kramer omitted from his argument. 838 F.3d at 768–69.

- 2 -

More important, by its own terms, the *Prather* exception does not apply in these circumstances. The *Prather* exception is limited to three specific instances, none of which are present here: (1) the relator has "personal knowledge that the claims were submitted;" (2) the relator has "personal knowledge of billing practices or contracts with the government;" or (3) the relator has "personal knowledge that was based either on working in the defendants' billing departments, or on discussions with employees directly responsible for submitting claims to the government." 838 F.3d at 769 (internal quotation marks and citations omitted). Despite his reliance on that decision, Dr. Kramer does not plead any facts suggesting that any of these exceptions apply. Conversely, Dr. Kramer admits that his false-claims allegations are not based on personal knowledge. Instead, Dr. Kramer's allegations are "based on information he privately learned from Defendants' patients and employees" (Dkt. 54, PAGEID 624), none of whom were "directly responsible for submitting claims to the government." *Prather*, 838 F.3d at 769.

Equally important, and as *Prather* itself recognized, the Sixth Circuit had never applied the exception before and has not applied it since. 838 F.3d at 769 ("'we have yet to apply a relaxed Rule 9(b) standard in practice.'") (citation omitted); *see also U.S. v. Fazzi Assocs., Inc.*, No. 1:15-CV-511, 2019 WL 6117299, at *6 (S.D. Ohio Nov. 18, 2019) (refusing to apply the relaxed standard from *Prather*, "the first and only Sixth Circuit case to find the 'strong inference' standard met," because the relator did not provide "details related to the billing process.") Moreover, the circumstances in *Prather* were different. The *Prather* relator was "hired by [the defendant] to review documentation related to thousands of patients," for the purpose of "review[ing] and submit[ting] final Medicare claims." 838 F.3d at 754. Based on that unique position in the billing department, she was able to plead "the specific circumstances of four

representative patients" *and* attach "spreadsheets listing information regarding ***hundreds*** of other claims that . . . suffered from similar defects." *Id.* at 758 (emphasis added).

Dr. Kramer is not similarly situated with the *Prather* relator. He claims he identified "six representative patients" (Dkt. 54, PAGEID 627),[2] but the TAC does not provide enough information to show that the six patients are actually "representative" of anything. All that Dr. Kramer has alleged is that he disagreed with the treatments received by these six patients. He has not alleged facts indicating when and how often he agreed with the treatments received by other patients who were previously seen by Dr. Doyle or the CDC dentists. In *Bledsoe II*, the Sixth Circuit held that a relator's examples must be "representative samples of the broader class of claims":

> The claims that are pled with specificity must be "characteristic example[s]" that are "illustrative of [the] class" of all claims covered by the fraudulent scheme. The examples of false claims pled with specificity should, in all material respects, including the general time frame, substantive content, and relation to the allegedly fraudulent scheme, be such that a materially similar set of claims could have been produced with a reasonable probability by a random draw from the total pool of all claims. With this condition satisfied, the defendant will, in all likelihood, be able to infer with reasonable accuracy the precise claims at issue by examining the relator's representative samples, thereby striking an appropriate balance between affording the defendant the protections that Rule 9(b) was intended to provide and allowing relators to pursue complex and far-reaching fraudulent schemes without being subject to onerous pleading requirements.

501 F.3d at 510–11 (internal citations omitted).

Dr. Kramer has not alleged sufficient facts to indicate that the six patients he happened to see after they were seen by Dr. Doyle or the CDC dentists are "representative" of anything.

---

[2] Dr. Kramer concedes, as he must, that no claims were submitted for Patients 4 and 8, which is why he refers to six patients in his Opposition. (*See, e.g.*, Dkt. 54, PAGEID 620 ("Patients 4 and 8 are not pled as example false claims.").)

These patients were seen at different times by different dentists and received different treatments. It is equally plausible that these patients are outliers and that Dr. Kramer and the unnamed CDC dentists would agree on the course of treatment for the CDC Entities' hundreds of other patients. For instance, **all** of the patients postdating NADG's alleged involvement were treated at Dr. Doyle's CDC Martins Ferry location.  (Dkt. 37 ¶¶ 201, 221, 239, 255 (discussing Patients 5, 6, 7, and 8).)  Far from alleging a widespread "representative" scheme across all NADG-affiliated offices in Ohio and Pennsylvania, Dr. Kramer has alleged nothing more than a few examples from a single location.[3]

Dr. Kramer wants to turn the *Prather* exception upside down.  In *Prather*, the relator alleged "significant detail" of the alleged scheme and "provide[d] a detailed overview of the alleged fraudulent scheme."  838 F.3d at 768–69.  The relator provided information about hundreds of patients as well as additional detail about four specific patients who were "representative" of the overall scheme. *Id.* at 758–59.  Here, by contrast, Dr. Kramer has alleged information about six different patients and wants the Court to infer that these patients are "representative" of a scheme that he has no personal knowledge of and that he has no detailed information to provide.  There is, thus, no basis for applying the *Prather* exception here, because nothing indicates that Dr. Kramer's six "representative" patients are representative of anything.

Unable to rely on the *Prather* exception, Dr. Kramer's unsupported allegation that NADG caused the submission of false claims falls apart.  For example, Dr. Kramer alleges that

---

[3]     Dr. Kramer argues that "NADG improperly characterizes facts to paint Dr. Kramer as a competitor due to service on an Ohio Dental Association Task Force."  (Dkt. 54, PAGEID 620 n.3.)  Both Dr. Kramer and Dr. Doyle operate dental practices in Martins Ferry, Ohio, making them direct competitors.  (*Compare* Dkt. 37 ¶¶ 14–15 *with id.* ¶ 22.)  Dr. Kramer also referenced the task force in the TAC, without mentioning that it is "now dissolved." (Dkt. 37 ¶ 164; Dkt. 54, PAGEID 620 n.3.)  The article NADG cited includes the following quote from the task force's chair:  "The DSO Task Force was established to attempt to see where the ODA could help solo and small group practices **compete** in the same space as corporate or DSO supported practices."  *See* Jackie Best Crowe, *ODA researching new benefits to support dental offices, including in-office dental plan and group buying arrangement*, Ohio Dental Association (June 7, 2019) https://www.oda.org/news/detail.dT/oda-researching-new-benefits-to-support-dental-offices-including-in-office-dental-plan-and-group-buying-arrangement/?fullsite (emphasis added).

"Patient 7 was treated at CDC of Martins Ferry on May 10, 2019, after it was acquired and under the control of NADG." (Dkt. 54, PAGEID 628.) Dr. Kramer alleges generally, however, that "**Defendants** submitted a false claim to Ohio Medicaid for this treatment." (*Id.* (emphasis added).)[4] In grouping all Defendants together, Dr. Kramer fails to allege each Defendant's specific role in submitting, or causing submission of, this alleged false claim, which is fatal to Dr. Kramer's claims against NADG. *See Fazzi*, 2019 WL 6117299, at *8 (dismissing FCA claim because although the relator pleaded "details related to the alleged upcoding scheme," the relator "failed to plead with the level of specificity required by Rule 9(b) that a specific claim was submitted to the government.").

For Patient 1, the other alleged "representative example" he specifically discusses (Dkt. 54, PAGEID 628–29), Dr. Kramer alleged a "chart containing billing details concerning Complete Dental Care's false claims for payment to Ohio Medicaid." (Dkt. 37 ¶¶ 132–134.).) Dr. Kramer admits, however, it was "CDC [that] submitted false claims to Ohio Medicaid for Patient 1" (Dkt. 54, PAGEID 628), because it is undisputed that these claims long predate NADG's alleged involvement. (*Compare id.* (explaining that CDC treated Patient 1 "between August 4, 2015 and September 30, 2016") *with* Dkt. 37 ¶ 33 (conceding that NADG's alleged involvement did not begin until "late 2018.").) Crucially, Dr. Kramer does not allege or provide a detailed chart "containing billing details" for *any* other "representative patients," including all of the patients that postdate NADG's alleged involvement. Because Dr. Kramer fails to allege facts showing that NADG caused the submission of false claims, or facts that would allow for application of the *Prather* exception, Dr. Kramer's claims against NADG fail as a matter of law.

---

4       Dr. Kramer misinterpreted NADG's group-pleading argument as applying only to the impermissible grouping of NADG and NADM. (Dkt. 54, PAGEID 642.) Dr. Kramer's pleading deficiency is much broader. The TAC lumps **all** Defendants together, not just NADG and NADM. (*See* Dkt. 49, PAGEID 591–92.)

## 2. The "Who, What, When," Highlights The TAC's Deficiency

Dr. Kramer's Opposition illustrates that he has not adequately pleaded, as to NADG, the "who, what, when, where, and how of the alleged fraud." *See Sanderson*, 447 F.3d at 877 (citation and internal quotation marks omitted). In an attempt to show that he has pleaded a detailed scheme, Dr. Kramer uses an entire subsection of his Opposition addressing these elements. (Dkt. 54, PAGEID 624–27.) Dr. Kramer's framing of this argument shows, however, that he has not satisfied these elements as to NADG.

For instance, Dr. Kramer attempts to satisfy the "who" element by grouping together "Dr. Robert Doyle, CDC, and NADG."[5] (*Id.* at 624.) But other than a single generalized reference to NADG's CEO, obtained from a public website (*id.* at Ex. I.), Dr. Kramer does not allege any specific individuals from NADG involved in the alleged scheme. (Dkt. 37 ¶ 34.) In *United States ex rel. Martin v. Life Care Ctrs. of Am., Inc*., No. 1:08-CV-251, 2014 WL 11429265 (E.D. Tenn. Mar. 26, 2014), which is also discussed below (*see infra* II.B), the relator alleged specific facts regarding the defendant's individual employees involved in the scheme. *See id.* at *13 ("in 2006, Antoinette Muelke, then the Regional Rehab Director for the Sun States region in Florida, sent an email on June 8 to all the Rehab Managers in her region asking those managers whose facilities had Ultra High percentages below 61 percent to create an action plan on 'how you will make it happen.'"). The TAC includes no comparable allegations as to NADG.

Further, to satisfy the "how" element, Dr. Kramer lists five specific methods by which "Defendants' scheme was accomplished: "Performing medically unnecessary root canals on teeth that did not require such work; Performing medically unnecessary root canals on grossly decayed teeth that required complete extraction and removal; Only offering patients the highest

---

[5] *See* Footnote 4 and accompanying text.

reimbursing treatment option and failing to offer patients lower cost treatment alternatives . . . ; Directing non-dentist[s] to perform parts of the root canal and restoration (filling) procedures only licensed dentists can perform in Ohio; and Setting unrealistically high daily financial goals (five times higher than the local area supports)."  (Dkt. 54, PAGEID 626–27.) Crucially, Dr. Kramer does not allege even in conclusory fashion that NADG is involved in **any** of these treatment decisions or financial goals.  (*See also* II.B.)

The same is true for Dr. Kramer's allegations regarding the "what" element, which groups together all Defendants without distinction (*see* footnote 4 and accompanying text; *see also* Dkt. 54, PAGEID 624–26); the "when" element, which extends back to "at least 2015" (Dkt. 54, 626), three years before NADG's alleged involvement began (Dkt. 37 ¶ 33); and the "where" element, which refers to nonspecific "CDC and NADG dental offices owned or controlled by Defendants in Ohio."  (*Id.*)  Unlike the relator in *Martin*, who "detail[ed] specific dates, locations, and persons supporting its claims," the TAC includes no specific allegations regarding NADG's involvement in the alleged scheme.  2014 WL 11429265, at *13.  For this separate and independent reason, the Court should dismiss Dr. Kramer's claims against NADG.

### 3.    The TAC Does Not Allege That NADG "Enlarged" A Scheme

Dr. Kramer's assertion that NADG is "proliferating the scheme" is based on a leap in logic that cannot support liability under the FCA.  (Dkt. 54, PAGEID 614, 630–631, 637.) NADG's liability is based on the allegation that it "is actively proliferating Doyle's fraud scheme," because "Dr. Kramer was told by another dental industry professional [that NADG] is now sending Doyle to treat Medicaid patients at numerous other North American Dental Group-controlled practices in Ohio."  (Dkt. 37 ¶ 40.)  Dr. Kramer, indeed, added NADG as a Defendant "[a]fter receiving evidence that [it was] . . . proliferating Doyle and CDC's scheme."  (Dkt. 54, PAGEID 614.)   But Dr. Kramer has failed to allege sufficient facts to establish that the

information he added in the TAC constitutes reliable evidence on this point.  He has also failed to allege facts establishing that such information provides a sufficient basis to support the huge inferences that he is asking the Court to draw in his favor.

*First*, Dr. Kramer has not alleged any facts indicating that the "dental industry professional" he relies on has or could have any personal knowledge of NADG's or Dr. Doyle's conduct—for example, the person is not identified, whether the person ever worked for Dr. Doyle or the CDC Entities is not explained, and it is not even clear whether the person is a dentist or simply works in the dental industry.  *Second*, what the "dental industry professional" allegedly said is far away from what Dr. Kramer interprets the person as saying.  Critically, if the "dental industry professional" had actually said that NADG's conduct was proliferating a fraud scheme, Dr. Kramer presumably would have alleged that.  His failure to do so indicates that the "dental industry professional" said no such thing.  Assuming the truth of this allegation would require the Court to infer that, simply because NADG is allegedly sending Doyle to treat patients at other offices, it must be "proliferating" Doyle's fraud scheme.  This is yet another example where Dr. Kramer asks the Court to "make inference upon inferences," which is insufficient to support liability under the FCA.  *See U.S. ex rel. Harper v. Muskingum Watershed Conservancy Dist.*, 842 F.3d 430, 438 (6th Cir. 2016) (citation omitted).

Dr. Kramer argues that the TAC added facts to support this allegation, because it listed "NADG's Ohio offices where Doyle is now registered to treat Medicaid beneficiaries."  (Dkt. 54, PAGEID 640.)  But simply listing all of NADG's affiliated practices in Ohio does not tell the Court or NADG anything.  For this allegation to support liability under the FCA, Dr. Kramer would have had to allege the specific practices where Dr. Doyle is spreading his alleged scheme, not simply list all of NADG's affiliated practices in Ohio and ask the Court to infer that

- 9 -

Dr. Doyle must be spreading the scheme to all of them. The TAC merely alleges in conclusory fashion that Dr. Doyle's alleged teachings on profitability somehow relate to "the false claims scheme" underlying the TAC. (Dkt. 37 at ¶ 269.) Without additional facts showing that Dr. Doyle's teachings on profitability somehow relate to the alleged scheme, there is no basis for inferring that NADG is "proliferating" it.

Finally, Dr. Kramer argues that "NADG cites no authority to support its claim that a list of addresses must be pled" (Dkt. 54, PAGEID 640), but that argument fails for two reasons. *First*, NADG cites *Sanderson* for the proposition that Dr. Kramer must plead the "who, what, when, ***where***, and how" allegations required under Rule 9(b). 447 F.3d at 877 (emphasis added). *Second*, NADG never argued "that a list of addresses must be pled." Instead, NADG emphasized that the TAC does not name even one specific dental practice where Dr. Doyle purportedly taught lessons on profitability or how he did so. The TAC includes nothing but conclusory allegations regarding NADG's alleged "proliferation" of Dr. Doyle and the CDC Entities' alleged scheme; and such allegations fail to state a claim under the FCA.

### B. Dr. Kramer Concedes That NADG Did Not Control Clinical Decisions

Dr. Kramer concedes that NADG does not, and at all times did not, control the clinical decisions that are the basis for this action. Lacking personal knowledge or plausible facts about NADG's relationship with Dr. Doyle and the CDC Entities, Dr. Kramer instead relies on an interview of NADG's CEO on Counsel's website to establish control. (Dkt. 54, PAGEID 640; Exhibit I.) Rather than "control," however, the interview demonstrates the opposite. NADG "provide[s] all the backend service" to dental practices, allows dentists "to focus on Dentistry rather than business administration," and does "not provide . . . dental care." In full, the section quoted by Dr. Kramer is:

> We typically work with our Dentists to acquire an existing dental office, provide all the backend services for that office, and allow our Doctor partners to focus on Dentistry rather than business administration …. Between the Management Company and our affiliated PC's, we support every aspect of the business. We centralize the finance, accounts payable and receivable, HR, IT operations—the full business life cycle. We also have a patient service call center. The only thing we do not provide is the dental care. … It's prudent for the businesspeople to handle the business aspects and the dentist to handle the clinical aspects.

(Dkt. 54, PAGEID 640 (underlining in original; emphasis added).) Far from showing any involvement of NADG in Dr. Doyle or the CDC dentists' clinical decisions, this quote—on which Dr. Kramer relies—concedes that NADG has no role in the conduct underlying his defective claims.

Instead, the allegations in all four of Dr. Kramer's complaints center on Dr. Doyle and the CDC Entities. (*See, e.g.*, Dkt. 54, PAGEID 631 (admitting that "Doyle exercised his control to enforce the scheme" and not NADG); *id.* at PAGEID 642 ("the CDC Defendants [are] a group of dental offices commonly owned, controlled, and mentored by Defendant Doyle").) Dr. Kramer is unequivocal that his claims arise from allegations that "Defendants regularly perform medically unnecessary root canals and other dental procedures on Ohio Medicaid beneficiaries and direct non-dentists to perform dental services that only licensed dentists can perform." (*Id.* at PAGEID 614.) Certainly, NADG did not "perform" any dental procedures.

More important, Dr. Kramer has not pleaded any facts linking NADG to any dentists' conduct or clinical decision. That makes sense, because Dr. Kramer admits that when he filed this action on May 13, 2018, NADG had no involvement with Dr. Doyle and the CDC Entities. (*See* Dkt. 37 ¶ 33 (admitting that NADG had no involvement with Complete Dental Care until "late 2018"); Dkt. 54, PAGEID 621 (same).) Nevertheless Dr. Kramer has attempted, through multiple amendments, to shoehorn allegations directed at Dr. Doyle and the CDC Entities into claims against NADG.

Instead of pleading facts to establish that NADG controlled or could control the clinical decisions of CDC dentists, Dr. Kramer cites to *Martin*, 2014 WL 11429265, arguing that "[t]he False Claims Act contains no exception exonerating corporations from liability for medically unnecessary services provided by medical professionals." (Dkt. 54, PAGEID 631.) Leaving aside that NADG has never made that argument, Dr. Kramer's citation to *Martin*—just like his quotation to NADG's CEO—illustrates why his claims must be dismissed.

In *Martin*, Life Care argued that its "individual physicians [were] the responsible parties," seeking to "shift any liability from [Life Care] to its therapists." 2014 WL 11429265, at *9. Although the court agreed "that a determination of what services are medically necessary and reasonable must be made by a physician qualified to make those determinations," the Government alleged at least fourteen specific facts showing Life Care's "actions to influence and direct" those professionals. *Id.* The Government's complaint also "provide[d] numerous examples of specific managerial employees who directed these actions and specific Life Care divisions in which these actions took place." *Id.*

Nothing that the *Martin* court considered to be dispositive is present in this case. *First*, the alleged "scheme" began at least three years before NADG had any relationship with Dr. Doyle and the CDC Entities. (Compare Dkt. 37 ¶ 3 (alleging that the "False Claims Act violations began on or before 2015 and are ongoing to the present."); *with id.* ¶ 33 ("In late 2018, North American Dental Group purchased or acquired a management interest in Dr. Doyle's Complete Dental Care practices."). *Second*, Dr. Kramer can make no allegation that NADG's management created any "action plans" to increase medically unnecessary procedures. *Third*, Dr. Kramer admits that NADG and the CDC Entities are different legal entities, and that CDC dentists performed all of the allegedly "unnecessary procedures." (Dkt. 37 ¶¶ 27–29, 101, 137,

148, 180, 201, 221, 239, 255.)  Dr. Kramer does not contest that NADG "does not employ dentists to perform clinical services and does not own dental practices." (NADG's Motion to Dismiss, Dkt. 49 at 10, PAGEID 572.)

Perhaps to fit within *Martin* or to avoid his concessions, Dr. Kramer asserts for the first time in the Opposition that "financial . . . pressures were exerted by NADG and caused the unnecessary and unlicensed care for which payment was falsely claimed" and that it "examined and tracked the finances of its dentists and rewarded the highest performing dentists with equity interests." (Dkt. 54, PAGEID 637.)  Previously, Dr. Kramer alleged that "**Complete Dental Care** subjected [patients] to a high-pressure sales pitch" (Dkt. 37 ¶ 98) (emphasis added); and that CDC employees told him there was "high pressure to sell treatment plans to patients." (*Id.* ¶ 174.)  As Dr. Kramer admits, those allegations predate NADG's involvement.  (*See id.* ¶¶ 162–79 (describing Dr. Kramer's alleged encounter with three Complete Dental Care employees on April 13, 2018); *see also id.* ¶ 33 (admitting that NADG had no involvement with Complete Dental Care until "late 2018"); Dkt. 54, PAGEID 621 (same).)  Indeed, none of Dr. Kramer's four complaints alleged that NADG exerted any pressure on anyone.[6]

Courts in this District hold "that a complaint cannot be amended by briefs in opposition to a motion to dismiss."  *RLFShop, LLC v. Am. Express Co.*, No. 3:17-CV-405, 2019 WL 499835, at *4 (S.D. Ohio Feb. 8, 2019) (quoting *General Electric Co. v. S&S Sales Co.*, No. 1:11CV00837, 2012 WL 2921566, at *4 (N.D. Ohio July 17, 2012) (granting motion to dismiss)).  The Sixth Circuit has likewise held that courts are "limited . . . to the facts and legal claims as raised in the pleadings."  *Johnson v. Metro. Gov't of Nashville & Davidson Cty., Tenn.*,

---

[6] Dr. Kramer cites to TAC paragraphs 30–32 for the proposition that NADG examined and tracked dentists' finances, which "*can* lead to unnecessary dental care." (Dkt. 54, PAGEID 637 (emphasis added).)  But none of those paragraphs mention specific facts about NADG.  Instead, Dr. Kramer cites a 2013 U.S. Senate Committee report that does *not* mention NADG in an attempt to impute alleged conduct of other DSOs to NADG.  Such a pleading tactic is illogical and improper. *See infra* II.C.

502 F. App'x 523, 542 (6th Cir. 2012) (quoting Moore's Federal Practice § 12.34 ("The court may not . . . take into account additional facts asserted in a memorandum opposing the motion to dismiss, because such memoranda do not constitute pleadings under Rule 7(a).")).  For that reason, the Court should disregard Dr. Kramer's conclusory statement that NADG exerted financial pressure that led to the alleged false claims, because Dr. Kramer raised it for the first time in his Opposition, which is improper.

Moreover, Dr. Kramer's vague and unsubstantiated claims about financial interests do not permit the TAC to survive, even if the Court considered the new allegations.  Dr. Kramer accuses NADG of nothing more than operating a business, which the FCA does not prohibit. Further, Dr. Kramer's accusations do not equate to the Government's particularized factual allegations of corporate pressure in *Martin*.  Instead, Dr. Kramer asks the Court to "make inference upon inferences" that NADG's alleged financial tracking and equity grants somehow rise to the level of corporate pressure and direct control Life Care exerted in *Martin*.  *See, e.g.*, *Harper*, 842 F.3d at 438 (internal quotation marks and citation omitted).  Following the Sixth Circuit's lead in *Harper*, there is no reason for the Court "to engage in such speculation." *Id.*

In short, Dr. Kramer has conceded that NADG does not, and did not, control the clinical decisions at issue.  Dr. Kramer has also failed to bolster his claims against NADG with unpleaded "new" allegations of "financial pressure."

### 1.    Differences In Medical Opinion Are Not Actionable Under The FCA

The TAC alleges nothing more than a difference of opinion among dentists exercising independent clinical judgment, which cannot give rise to a false claim as a matter of law.  *See, e.g.*, *U.S. v. AseraCare, Inc.*, 938 F.3d 1278, 1297 (11th Cir. 2019) (explaining that "to properly state a claim under the FCA . . . a plaintiff . . . must identify facts and circumstances . . . that are inconsistent with the proper exercise of a physician's clinical judgment.").  Dr. Kramer claims

that his allegations satisfy the requirements of *U.S. v. Paulus*, 894 F.3d 267 (6th Cir. 2018), because he alleges "that Medicaid's medical necessity and clinical coverage and documentation requirements . . . were not satisfied." (Dkt. 54, PAGEID 615.) But *Paulus*, a criminal case, does not support Dr. Kramer's argument.

In *Paulus*, an expert witness testified that the defendant "repeatedly and systematically saw one thing . . . and consciously wrote down another, and then used that misinformation to perform and bill unnecessary procedures." 894 F.3d at 276. The Sixth Circuit upheld the defendant's conviction, because he ordered unnecessary stents after intentionally misrepresenting angiogram results. *Id*. Here, Dr. Kramer argues that "the root canals and other improper procedures were objectively unnecessary." (Dkt. 54, PAGEID 632.) But he does not allege any facts to support the notion that the CDC dentists' medical judgments were not "given honestly." *Paulus*, 894 F.3d at 275. *Paulus*, thus, cannot support Dr. Kramer's argument, because he has not pleaded any facts showing that the CDC dentists' ***knew*** that the root canals and other procedures were improper, but nevertheless performed them anyways.

Even assuming the truth of Dr. Kramer's allegation that "the root canals and other improper procedures were objectively unnecessary" (Dkt. 54, PAGEID 632), at best he has pleaded sufficient facts for some patients to bring a malpractice action against the unnamed CDC dentists. Without facts showing that the CDC dentists knew the procedures were unnecessary but performed them anyways, these allegations do not rise to the level of the intentional fraudulent conduct described in *Paulus*. If Dr. Kramer's allegations were enough to give rise to FCA liability, then any business entity affiliated with a medical professional would be liable under the FCA, which would turn malpractice actions involving Medicaid or Medicare patients into FCA cases. Dr. Kramer does not cite any authority that would support such a result.

### 2.     NADG Cannot Be Liable As A Corporate Successor

In passing, Dr. Kramer suggests that NADG should be liable as a corporate successor because it "did nothing to stop CDC's schemes." (Dkt. 54, PAGEID 630.) But Dr. Kramer pleads no facts suggesting that NADG was aware of the alleged false claims, let alone that it could have stopped them. He has thus "failed to show anything more than a possibility that [the defendant] acted unlawfully," which is insufficient under the FCA. *Harper*, 842 F.3d at 438.

NADG cannot be liable for Dr. Doyle and the CDC Entities' alleged fraudulent actions, because NADG expressly avoided assuming such liabilities when it purchased the CDC Entities' assets in an asset-only sale. The TAC alleges in some places that NADG owns the Doyle Entities and in others that it merely acquired an interest. (*Compare* Dkt. 37 ¶ 271 *with* ¶ 268.) But assuming the truth of the TAC's allegations that NADG merely "acquired an interest," Dr. Kramer's claims against NADG fail as a matter of law.

Ohio law governs the asset purchase agreement between NADG and the CDC Entities.[7] Under Ohio law, a company that purchases a corporation's assets is not liable for the seller's obligations absent extraordinary circumstances that the TAC does not allege here. *Welco Indus., Inc. v. Applied Cos.*, 67 Ohio St. 3d 344, 346 (1993) ("The well-recognized general rule of successor liability provides that the purchaser of a corporation's assets is not liable for the debts and obligations of the seller corporation. … Equally well recognized are the four exceptions to this general rule.") (internal citations omitted). Ohio is not unique in this regard; this principle of successorship is well-established nationwide. *See, e.g.*, *IBC Mfg. Co. v. Velsicol Chemical Corp.*, 187 F.3d 635, at *2–3 (6th Cir. 1999) (explaining that, under Tennessee or Delaware law,

---

[7]     Common law principles of successor liability apply to actions arising under the FCA. *See, e.g.*, *U.S. ex rel. Bunk v. Government Logistics N.V.*, 842 F.3d 261, 274 (4th Cir. 2016) ("Put simply, the FCA does not speak to successor corporation liability and thus has no impact on the traditional common law principles governing successor corporation liability.").

"a corporation that purchases the assets of another corporation does not automatically become liable for the obligations of the seller").

Nor is there any other basis to conclude that NADG is the CDC Entities' successor-in-interest.  Courts have recognized four limited exceptions in which an asset purchaser can be deemed to succeed to liability:  (i) the buyer agrees to assume the liability; (ii) the transaction is a de facto merger; (iii) the buyer is a mere continuation of the seller; or (iv) the transaction's purpose was to fraudulently escape liability.  *Welco Indus.*, 67 Ohio St. 3d at 347; *see also IBC Mfg. Co.*, 187 F. 3d, at *2 (addressing the same four exceptions).

But the TAC has not alleged that any of the four exceptions applies here; nor could they.  The terms of the parties' asset purchase agreements show that NADG did not assume any liabilities of the CDC Entities.  Further, the TAC alleges that the CDC Entities are still in operation.  (*See, e.g.*, Dkt. 37 ¶¶ 16, 20–27.)  Those facts negate any suggestion that the parties' asset purchase agreements:  (a) resulted in a *de facto* merger; (b) provided for the mere continuation of a predecessor corporate entity; or (c) was engineered to fraudulently escape liability.

Indeed, the TAC alleges no facts suggesting that any of the four exceptions applies.  Without such facts, Dr. Kramer's successorship allegation is merely a "label and conclusion" that cannot clear the facial-plausibility hurdle.  *See, e.g.*, *Forman v. Meridian Bioscience, Inc.*, 367 F. Supp. 3d 674, 688 (S.D. Ohio 2019) (explaining that to "withstand a dismissal motion, a complaint must contain 'more than labels and conclusions'") (citation omitted).  To the extent Dr. Kramer alleges that NADG is liable as a corporate successor, the Court should dismiss his claims.

### C.     <u>Dr. Kramer's Most Recent Amendments Did Not Add Material Allegations</u>

The "new" allegations Dr. Kramer added to the TAC derive from publicly-available sources, which cannot cure the lack of factual support for the claims against NADG. The United States opposed NADG's public-disclosure argument, preventing dismissal of Dr. Kramer's claims on public-disclosure grounds, which NADG does not dispute. (*See* Dkt. 53.) But Dr. Kramer's reliance on publicly-available information, nearly all of which relates to NADG's assumed "control" over Dr. Doyle and the CDC Entities, is telling. If Dr. Kramer were aware of any facts regarding NADG's involvement in the alleged scheme, or its "control" over Dr. Doyle and the CDC Entities, he would or should have pleaded them by now. The addition of such public information to Dr. Kramer's TAC cannot satisfy Rule 9(b)'s particularity requirement, even where the Court cannot dismiss the claims against NADG on public-disclosure grounds. That Dr. Kramer is now relying on information from the internet and congressional reports (that say nothing about NADG) makes evident that Dr. Kramer is not aware of any facts linking NADG to the alleged scheme. (*See* Dkt. 54, PAGEID 649 (admitting that "NADG, CDC, and Doyle are not mentioned in the Congressional Staff Report.").)

### D.     <u>Dr. Kramer's Fourth Attempt To Plead Should Be Dismissed With Prejudice</u>

Dr. Kramer's last-minute aside to the Court requesting leave to add "significant" but unidentified "additional corroborating evidentiary details," should "the Court be inclined to dismiss any part of the case," is improper and should be denied. (Dkt. 54, PAGEID 650.) Without seeking leave, attaching the proposed amendments, or even describing why those "details" were not previously pleaded, Dr. Kramer's request cannot avoid a dismissal with prejudice. *See United States ex rel. Roycroft v. Geo Grp., Inc.*, 722 F. App'x 404, 408–09 (6th Cir. 2018) (dismissing FCA claims because the relator failed "to identify what [relator] might plead to save her claim").

The Sixth Circuit "disfavor[s]" such "bare request[s]" for leave to amend "in lieu of a properly filed motion for leave to amend." *PR Diamonds, Inc. v. Chandler*, 91 F. App'x 418, 444 (6th Cir. 2004) (affirming denial of leave to amend following dismissal, even though the plaintiff had only "amended once"). "An open request for the Court to permit amendment to cure deficiencies, once the Court identifies those deficiencies, will not defeat a meritorious motion to dismiss pursuant to Rule 12(b)(6)." *Begala v. PNC Bank, Ohio, N.A.*, 214 F.3d 776, 784 (6th Cir. 2000) (quoting the District Court). As a matter of law, Dr. Kramer is "not entitled to a directive from the district court 'informing them of the deficiencies of the complaint and then an opportunity to cure those deficiencies.'" *Graham v. Fearon*, 721 F. App'x 429, 439 (6th Cir. 2018) (quoting *Begala*, 214 F.3d 776, 784). "[I]f a party does not file a motion to amend or a proposed amended complaint, it is not an abuse of discretion for the district court to dismiss the claims with prejudice." *CNH Am. LLC v. UAW*, 645 F.3d 785, 795 (6th Cir. 2011).

"This Court has previously followed the court of appeals' rationale in rejecting throwaway requests for amendment related to motion[s] to dismiss." *Culy Constr. & Excavating, Inc. v. Laney Directional Drilling Co.*, No. 2:12-CV-4, 2012 WL 12942602, at *1 (S.D. Ohio Aug. 13, 2012). Specifically, the Court has recognized that "[c]ourts in this circuit '[do] not look favorably upon bare requests for leave to amend in a response to a motion to dismiss when the requesting party could have filed a proper motion to amend and attached a proposed amended complaint for consideration by the court.'" *In re Porsche Cars N. Am., Inc.*, 880 F. Supp. 2d 801, 881–82 (S.D. Ohio 2012) (alternation in original) (quoting *Techdisposal.com, Inc. v. CEVA Freight Mgmt.*, No. 2:09–cv–356, 2009 WL 4283090, at *4 (S.D. Ohio Nov. 30, 2009)).

Dr. Kramer makes precisely this type of improper "throwaway request" in his Opposition. Dr. Kramer suggests that he could "add significant additional corroborating evidentiary details" to avoid dismissal. (Dkt. 54, PAGEID 650.) The extent of those "details," however, are just 30 or so words promising some information about "Patient 5," "CDC and NADG's billing procedures," "Doyle's scheme," and "how NADG is implementing Doyle's scheme at other locations." (*Id.*) Most important, Dr. Kramer "failed to explain how a [fourth] amended complaint would resolve the problems in the [third] amended complaint." *Crosby v. Twitter, Inc.*, 921 F.3d 617, 628 (6th Cir. 2019) (affirming dismissal with prejudice). Moreover, "[h]ad [Dr. Kramer] filed a motion to amend . . . and . . . identif[ied] the proposed amendments, the Court [could] have considered the motions to dismiss in light of the proposed amendments to the complaint." *Begala*, 214 F.3d 776, 784.

Dr. Kramer has given the Court no reason to believe that another attempt at pleading a claim will be any more successful than those that have come before. Consequently, Dr. Kramer's contingent request for leave to plead should be denied, and the claims against NADG should be dismissed with prejudice.

## III.   <u>CONCLUSION</u>

For these reasons, as well as the reasons described in its Motion and Memorandum in Support, NADG respectfully requests that the Court dismiss Dr. Kramer's claims against NADG with prejudice.

Dated:  February 6, 2020

Respectfully submitted,

_/s/ Andrew G. Fiorella_
Andrew G. Fiorella (0077005)
James J. Walsh, Jr. (0096660) (*pro hac vice*)
**BENESCH, FRIEDLANDER,**
      **COPLAN & ARONOFF LLP**
200 Public Square, Suite 2300
Cleveland, Ohio  44114
Telephone:    (216) 363-4500
Facsimile:    (216) 363-4588
E-Mail:    afiorella@beneschlaw.com
            jwalsh@beneschlaw.com

*-and-*

Mark J. Silberman (*pro hac vice*)
Stephen Chahn Lee (*pro hac vice*)
71 South Wacker Drive, Suite 1600
Chicago, Illinois  60606
Telephone:    (312) 212-4949
Facsimile:    (312) 767-9192
E-Mail:    msilberman@beneschlaw.com
            slee@beneschlaw.com

*Attorneys for Defendants North American*
*Dental Group, LLC and North American*
*Dental Management, LLC*

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that on February 6, 2019, a copy of the foregoing Reply in Support of Defendants North American Dental Group, LLC and North American Dental Management, LLC's Motion to Dismiss was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system. There are no parties requiring service by other means.

        */s/ Andrew G. Fiorella*
        Andrew G. Fiorella (0077005)
        **BENESCH, FRIEDLANDER,**
            **COPLAN & ARONOFF LLP**
        200 Public Square, Suite 2300
        Cleveland, Ohio 44114
        Telephone:     (216) 363-4500
        Facsimile:     (216) 363-4588
        E-Mail:        afiorella@beneschlaw.com

        *One of the Attorneys for Defendants North*
        *American Dental Group, LLC and North*
        *American Dental Management, LLC*