## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**UNITED STATES OF AMERICA ex
rel. JOHN N. KRAMER, D.D.S.,**

        **Plaintiff,**

    v.

**ROBERT A. DOYLE, JR., D.M.D., et
al.,**

        **Defendants.**

**Case No. 1:18-cv-373
JUDGE DOUGLAS R. COLE**

## <u>OPINION AND ORDER</u>

This matter comes before the Court on (1) Defendants' Robert A. Doyle, Jr., D.M.D., Complete Dental Care Calcutta, LLC ("CDC Calcutta"), Complete Dental Care Champion Heights, LLC ("CDC Champion Heights), Complete Dental Care Dennison, LLC ("CDC Dennison"), Complete Dental Care Martins Ferry, LLC ("CDC Martins Ferry"), Complete Dental Care Newcomerstown, LLC ("CDC Newcomerstown"), Complete Dental Care Shadyside, LLC ("CDC Shadyside"), and Complete Dental Care Steubenville, LLC ("CDC Steubenville") (together, the "CDC Defendants") Motion to Dismiss (Doc. 48); (2) Defendants' North American Dental Group, LLC ("NADG") and North American Dental Management, LLC ("NADM") (together, the "NADG Defendants") Motion to Dismiss (Doc. 49); (3) Plaintiff John N. Kramer, D.D.S.'s Motion for Leave to File Fourth Amended Complaint (Doc. 57); and (4) the NADG Defendants' Partially Unopposed Motion for Leave to File Surreply Brief, Instanter (Doc. 62). For the reasons that follow, the Court **GRANTS IN PART**

and **DENIES IN PART** the CDC Defendants' Motion to Dismiss (Doc. 48). The Court **GRANTS** the NADG Defendants' Motion to Dismiss (Doc. 49) in its entirety. Because further amendment would be futile, the Court also **DENIES** Kramer's Motion for Leave to File Fourth Amended Complaint (Doc. 57). Accordingly, the Court **DENIES AS MOOT** the NADG Defendants' Partially Unopposed Motion for Leave to File Surreply Brief, Instanter (Doc. 62). The Court **DISMISSES WITH PREJUDICE** all claims against Doyle, CDC Calcutta, CDC Champion Heights, CDC Dennison, CDC Newcomerstown, CDC Shadyside, and the NADG Defendants.

## BACKGROUND

For purposes of the instant motions to dismiss, the Court accepts as true the factual allegations in the operative Third Amended Complaint (Doc. 37). Thus, the Court reports and relies on those allegations here, but with the disclaimer that these facts are not yet established, and may never be.

On May 31, 2018, Kramer, a dentist who practices in Martins Ferry, Ohio, filed the original Complaint as the Relator in this *qui tam* action. (*See* Doc. 1). Kramer filed an Amended Complaint (Doc. 11) on March 6, 2019, and a Second Amended Complaint (Doc. 14) on June 4, 2019. On November 8, 2019, the United States declined to intervene. (*See* Doc. 26). Both sets of Defendants filed Motions to Dismiss (Docs. 28, 31) the Second Amended Complaint on November 12, 2019. Shortly thereafter, on December 3, 2019, Kramer filed a Third Amended Complaint (Doc. 37), which is now the operative complaint in this action.

In general terms, the Third Amended Complaint alleges that all Defendants violated the False Claims Act ("FCA") by submitting or causing submission to the Ohio Medicaid program of insurance claims for dental procedures, particularly root canals, that were not medically necessary or for which the individual who performed the procedure was not properly licensed. As to the former, Kramer recites that the Ohio Medicaid program requires any medical provider to enter a Provider Agreement that includes a requirement "[t]o render medical services as medically necessary for the patient and only in the amount required by the patient." (Third Am. Compl., Doc. 37, #459 (quoting Ohio Admin. Code 5160-1-17.2)). Medical necessity means that the treatment "[m]eets generally accepted standards of medical practice," "[i]s the lowest cost alternative that effectively addresses and treats the medical problem," and is "[n]ot provided primarily for the economic benefit of the provider." (*Id.* at #462 (quoting Ohio Admin. Code 5160-1-01(C))).

In addition to these general criteria, Kramer explains that Ohio Medicaid imposes certain specific requirements regarding root canals. First, root canals are "covered only when the overall health of the teeth … is good except for the indicated tooth or teeth." (*Id.* at #467 (quoting Ohio Admin. Code 5160-5-01(F)(1), App'x A at 7)). Second, "[t]he patient must experience chronic pain (as evidenced by sensitivity to hot or cold or through percussion or palpation), or there must be a fistula present that is associated with tooth infection or chronic systemic infection." (*Id.*). Third, if an x-ray or other "image" does not show a need for a root canal, "then the need for [a root canal] must be substantiated by clinical documentation." (*Id.*).

3

As for his licensing allegations, Kramer notes that Medicaid regulations limit reimbursement for dental services to those services that are provided by properly licensed dentists. (*Id.* at #463 (citing Ohio Admin. Code 5160-5-01(C)(1)(a), (C)(1)(b))). To be properly licensed, the dentist must hold a "current license from the state dental board." (*Id.* at 463–64 (citing Ohio Rev. Code 4715.09(A))). Among other things, non-dentists may not perform root canals or cut into teeth. (*Id.* at #494–95 (citing Ohio Rev. Code 4715.64(A))). Ohio Medicaid considers "[b]illing for services that are outside the current license limitations, scope of practice, or specific parameters of the person supplying the service" to be "fraud, waste, and abuse." (*Id.* at #495 (citing Ohio Admin. Code 5160-1-29(C)(9))).

Against that regulatory backdrop, the core theory of Kramer's Third Amended Complaint is that "the business practice and policy of Complete Dental Care is to submit false claims for medically unnecessary services to the Ohio Medicaid Program for federal funds." (*Id.* at #509). In support of this claim, Kramer makes allegations regarding eight specific patients who received or sought dental care from CDC Martins Ferry or CDC Steubenville, all of whom Kramer subsequently treated, and all of whom were Medicaid patients except one. Kramer alleges that the care his eight example patients received from (or, as to two patients, was offered by) CDC Martins Ferry or CDC Steubenville did not conform to either the general standards of the Ohio Medicaid program or its specific requirements regarding root canals. More specifically, Kramer alleges that each example patient actually received (or was

4

offered) one or more medically unnecessary root canals, and that some dental procedures were performed by individuals who were not licensed to perform them.

Kramer makes the following specific allegations with respect to each patient:

(1) CDC Martins Ferry performed seven root canals "of very poor quality" on Patient One over a period of three months without gathering preoperative x-rays, clinical tests, or any documentation of trauma or infection. (*See id.* at #470, 475–76). Less than two years later, personnel at CDC Martins Ferry recommended extraction of the same teeth on which the patient had previously received root canals. (*See id.* at #479). For Patient One only, Kramer identifies the date of each dental procedure, billing codes, and amounts paid by the Ohio Medicaid program. (*Id.* at #481–82).

(2) CDC Steubenville performed four medically inappropriate root canals on Patient Two's "grossly decayed" upper front teeth, teeth numbers 7–10, even though Patient Two did not want root canals and instead asked for removal of those teeth. (*Id.* at #483–84). When Patient Two sought removal instead of root canals, the CDC Steubenville dentist became angry and "threw instruments on the table." (*Id.* at #483). Performance of those root canals without placing crowns on the teeth "only delayed" extraction, which was inevitably necessary. (*Id.* at #484).

(3) During a single appointment, CDC Martins Ferry personnel performed six "poor quality" root canals for Patient Three on teeth that showed no need for that procedure in x-rays Kramer reviewed shortly afterward, and for which Patient Three had reported no pain, trauma, or signs of infection. (*See id.* at #485–88). CDC Martins Ferry personnel also failed to provide Patient Three or Kramer (as Patient Three's

subsequent dentist) with the preoperative x-rays or other documentation required for a root canal procedure by Ohio Medicaid. (*Id.* at #486).

(4) CDC Martins Ferry personnel proposed a medically unnecessary root canal on Patient Four, a child who was not a Medicaid beneficiary, for a tooth that showed no sign of need for such procedure in x-rays, and in which the child had no pain. (*Id.* at #492–93). Patient Four did not receive that root canal. (*See id.*).

(5) CDC Martins Ferry personnel performed three medically unnecessary root canals on Patient Five. (*See id.* at #497–98). In violation of Ohio licensure law, a non-dentist was the one who filled the root canals on two of the teeth with gutta-percha. (*Id.* at #496–97). CDC Martins Ferry personnel performed the root canal on the third tooth without informing Patient Five that it would do so. (*Id.* at #498). The third tooth subsequently required "extensive work" due to the poor quality of the unnecessary root canal. (*Id.*).

(6) Patient Six received a medically unnecessary root canal on one tooth and also received fillings on approximately twelve other teeth. (*See id.* at #500–02). Non-dentists cut into the teeth as part of the filling procedures in violation of Ohio licensure law. (*See id.* at #501–02).

(7) Patient Seven, a child, had pain in only one tooth, but CDC Martins Ferry personnel recommended "four or five" root canals, two of which they in fact performed. (*Id.* at #504–05). The procedures left an "inappropriate gap" between those two teeth, putting the patient at risk of infection. (*Id.* at #506). A non-dentist cut into a tooth in violation of Ohio licensure law. (*Id.* at #506–07).

(8) CDC Martins Ferry personnel told Patient Eight that he needed eighteen (18) root canals, nine of which it proposed to do the same day. (*Id.* at #507). According to Kramer, several of these teeth were so decayed that root canals would likely be unsuccessful and they would need to be extracted anyway. (*Id.* at #508). On the other hand, many of the remaining teeth showed no signs of needing root canals in Kramer's subsequent x-rays. (*Id.* at #509). Patient Eight did not receive root canals at CDC Martins Ferry.

With respect to the CDC Defendants other than CDC Martins Ferry and CDC Steubenville, Kramer alleges that Doyle owns all seven CDC branches named in the Third Amended Complaint, with sixteen other dentists working under Doyle's direction at the various locations. (*See id.* at #448). Kramer further alleges that "[a]s the owner and 'mentor' in control of all Complete Dental Care practices, Doyle directed the shared practices, procedures, and financial goals that drive the unnecessary and unlicensed dental procedures that Complete Dental Care inflicts on Medicaid patients at all of its locations." (*Id.* at #449). Kramer also alleges that Doyle sometimes calls employees of CDC practices on the phone if they do not make their daily revenue goals, although "not much" otherwise happens to such employees. (*Id.* at #491).

And as for the NADG Defendants, Kramer alleges that the parent company, NADG, "purchased or acquired a management interest in Dr. Doyle's Complete Dental Care practices" sometime in late 2018. (*Id.* at #453). This suggests that NADG had "purchased or acquired" that otherwise unspecified "management interest" by

the time Patients Six and Seven, and possibly Patient Five, received treatment at CDC Martins Ferry. Kramer alleges that the NADG Defendants knew the CDC Defendants could not maintain the revenue they were generating without continuing Doyle's practices of performing medically unnecessary dental procedures and of having non-dentists perform procedures that only dentists may perform under Ohio law. (*Id.* at #454). But Kramer alleges that the NADG Defendants nevertheless not only continued these practices but financially incentivized them by offering equity to dentists who met certain revenue targets. (*Id.*).

### THE PENDING MOTIONS

On December 24, 2019, the CDC Defendants and the NADG Defendants each moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). (Docs. 48, 49). The CDC Defendants argue that Kramer fails to state a claim against CDC Martins Ferry and CDC Steubenville because he only alleges that he disagrees with the medical treatment that the example patients were offered or received at those locations. (CDC Mot. to Dismiss ("CDC Mot."), Doc. 48, #556). The CDC Defendants also argue that Kramer has failed to identify any specific false claim or statement by Doyle and the five corporate CDC Defendants other than CDC Martins Ferry and CDC Steubenville. (*Id.* at #555). The NADG Defendants argue primarily that Kramer has failed to allege that any of them submitted or caused submission of a false claim or statement. (*See* NADG Mot. to Dismiss ("NADG Mot."), Doc. 49, #580). Kramer

responded in opposition (Doc. 54) on January 23, 2020,[1] and both sets of Defendants replied in support (Docs. 55, 56) on February 6, 2020.

On February 14, 2020, Kramer filed a Motion for Leave to File Fourth Amended Complaint (Doc. 57), to which he attached his Proposed Fourth Amended Complaint (*see* Docs. 57-1, 57-2). The Proposed Fourth Amended Complaint adds general factual allegations that Doyle directly instructed non-dental employees at CDC locations to add services to some patients' treatment plans that were not approved by the patient's treating dentist. (*See* Prop. Fourth Am. Compl., Mot. to Amend Ex. B, Doc. 57-2, #1093). Kramer's source for this information is "[a] former Complete Dental Care employee who worked at several Complete Dental Care offices in 2017, including Martins Ferry and Shadyside." (*Id.* at #1092). Another former employee, this one from NADG's Refresh Dental Office in Shaker Heights, Ohio, reported to Kramer that the NADG Defendants have sent Doyle to that location to lead an "Optimization Team" instructing dentists to perform medically unnecessary root canals and belittling dentists who refuse to do so. (*See generally id.* at #1095–98). Both sets of Defendants responded in opposition (Docs. 59, 60) to Kramer's Motion to Amend on March 6, 2020. Kramer replied in support (Doc. 61) on March 20, 2020.

---

[1] On the same day, the United States also responded in opposition (Doc. 53) to exercise its statutory veto power over the NADG Defendants' Motion to Dismiss to the extent that the NADG Defendants argue that the FCA's public disclosure bar is grounds for dismissal of Kramer's claims. (*See* U.S. Resp. in Opp'n to NADG Mot., Doc. 53, #599 (citing 31 U.S.C. § 3730(e)(4)(A))). The NADG Defendants do not contest that exercise of the government's statutory power in their Reply. (*See* Doc. 55, #902). Accordingly, the Court does not consider the public disclosure bar as a basis for dismissal here.

On April 2, 2020, the NADG Defendants filed a Partially Unopposed Motion for Leave to File Surreply Brief, Instanter (Doc. 62) in connection with Kramer's Motion to Amend. The NADG Defendants argue that a surreply is appropriate because Kramer's Reply in support of his Motion to Amend makes new arguments regarding the legal standard for liability under the FCA and attaches a then-recent *USA Today* article about the NADG Defendants' patient care practices. (*See* Mot. for Leave to File Surreply ("Surreply Mot."), Doc. 62, #1270–71). Kramer responded in opposition (Doc. 63) on April 23, 2020, opposing the NADG Defendants' Motion only in part. Specifically, Kramer does not oppose the NADG Defendants' request to file a surreply with respect to the *USA Today* article. (Resp. in Opp'n to Surreply Mot., Doc. 63, #1289). But Kramer does oppose granting the NADG Defendants leave to file a surreply in all other respects. (*See id.*).

## LEGAL STANDARD

At the motion to dismiss stage, a complaint must "state[] a claim for relief that is plausible, when measured against the elements" of a claim. *Darby v. Childvine, Inc.*, 964 F.3d 440, 444 (6th Cir. 2020) (citing *Binno v. Am. Bar Ass'n*, 826 F.3d 338, 345–46 (6th Cir. 2016)). "To survive a motion to dismiss, in other words, [plaintiffs] must make sufficient factual allegations that, taken as true, raise the likelihood of a legal claim that is more than possible, but indeed plausible." *Id.* (citations omitted).

In making that determination, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Bassett v. Nat'l Collegiate Athletic*

*Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (internal quotation omitted). That is so, however, only as to factual allegations. The Court need not accept as true a plaintiff's legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Moreover, the well-pled facts must be sufficient to "raise a right to relief above the speculative level," such that the asserted claim is "plausible on its face." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 546–47. Under the *Iqbal/Twombly* plausibility standard, courts play an important gatekeeper role, ensuring that claims meet a threshold level of factual plausibility before defendants are subjected to the potential rigors (and costs) of the discovery process. "Discovery, after all, is not designed as a method by which a plaintiff discovers whether he has a claim, but rather a process for discovering evidence to substantiate plausibly-stated claims." *Green v. Mason*, 504 F. Supp. 3d 813, 827 (S.D. Ohio 2020).

The plausibility requirement has additional teeth as to claims, such as those here, that assert fraud. That is because, under Federal Rule of Civil Procedure 9(b), a party alleging fraud must "state with particularity the circumstances constituting fraud," but "conditions of a person's mind may be alleged generally." That means that "a plaintiff, at a minimum, must 'allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'" *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.* ("*Bledsoe I*"), 342 F.3d 634, 643 (6th Cir. 2003) (quoting *Coffey v. Foamex L.P.*, 2 F.3d 157, 161–62 (6th Cir. 1993)). Stated another

way, a plaintiff must identify the "'who, what, when, where, and how' of the alleged fraud." *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006) (quoting *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)).

Because this case involves multiple defendants, another aspect of Federal Rule of Civil Procedure 9(b) also come into play. Specifically, the particularity requirement prohibits plaintiffs from relying on "group pleading." That is, "[a] complaint may not rely upon blanket references to acts or omissions by all of the defendants." *See, e.g., Bledsoe I*, 342 F.3d at 643. Rather, under Rule 9(b), "each defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which he individually stands charged." *Id; see also United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.* ("*Bledsoe II*"), 501 F.3d 493, 510 (6th Cir. 2007) ("[I]mproperly pled allegations of fraud do not become adequate merely by placing them in the same complaint with allegations that are sufficient …. Allowing such a complaint to go forward *in toto* would not provide defendants with the protections that Rule 9(b) was intended to afford them …."). Or phrased slightly differently, "[t]he prohibition on group pleading under Rule 9(b) prevents a plaintiff from simply lumping multiple defendants together without explaining each defendant's culpable role." *Sugarlips Bakery, LLC v. A&G Franchising, LLC*, No. 3:20-cv-00830, 2022 WL 210135, at *10 (M.D. Tenn. Jan. 24, 2022).

The Sixth Circuit has also interpreted Rule 9(b) to impose another requirement specific to FCA cases. To state a claim against a defendant for violating 31 U.S.C.

§ 3729(a)(1)(A), a plaintiff who alleges a fraudulent scheme "must also identify a representative false claim that was actually submitted to the government." *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 470 (6th Cir. 2011). That is because the FCA "attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the claim for payment." *Sanderson*, 447 F.3d at 877–78 (citation omitted). Accordingly, "Rule 9(b) does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *Id.* at 877. Instead, the false claim itself is "the *sine qua non* of a False Claims Act violation." *Id.* at 878.

To "identify" a specific claim, a plaintiff must include details such as claim submission dates or amounts that would allow the defendant "reasonably to pluck out" the allegedly fraudulent representative claim or claims "from all the other claims [it] submitted." *See United States ex rel. Owsley v. Fazzi Assocs., Inc.*, 16 F.4th 192, 197 (6th Cir. 2021). The Sixth Circuit has characterized this requirement as "stringent" at the pleading stage. *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 914 (6th Cir. 2017).

Finally, because Kramer has requested that this Court grant him leave to file his Proposed Fourth Amended Complaint in lieu of granting dismissal, another set of standards also comes into play. (*See* Resp. in Opp'n to Mots. ("Opp'n"), Doc. 54, #650; *see also* Mot. for Leave to File Fourth Am. Compl. ("Mot. to Amend"), Doc. 57). Under Federal Rule of Civil Procedure 15, a party may amend only with the opposing party's

written consent (which was not forthcoming here), or leave of the Court. As to the latter, although the question is committed to the trial court's discretion, the "court should freely give leave when justice so requires." *Foman v. Davis*, 371 U.S. 178, 182 (1962). When assessing whether to grant leave, the Court should consider whether there has been "undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, or whether the amendment would be futile." *Gen. Elec. Co. v. Sargent & Lundy*, 916 F.2d 1119, 1130 (6th Cir. 1990) (citation and internal quotation marks omitted).

## LAW AND ANALYSIS

This case turns largely on Federal Rule of Civil Procedure 9(b)'s requirement to allege fraud with particularity. As discussed above, in the context of FCA cases, the Sixth Circuit has interpreted Rule 9(b) to require a plaintiff to identify a specific representative false claim that was actually submitted to the government.[2] That is sometimes called the "presentment" requirement. *See, e.g.*, *United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 838 F.3d 750, 768 (6th Cir. 2016).

---

[2] There is an exception to this requirement for plaintiffs who allege that they have "personal knowledge" of a defendant's billing practices, sometimes dubbed "the *Prather* exception." *See United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 838 F.3d 750, 769 (6th Cir. 2016); *Ibanez*, 874 F.3d at 915. Such a plaintiff may allege facts supporting a strong inference that claims were submitted to the government without identifying a specific claim. *See Prather*, 838 F.3d at 769. Kramer does not allege personal knowledge of the Defendants' billing practices and apparently disavows reliance on the *Prather* exception. (*See* Reply in Supp. of Mot. for Leave to File Fourth Am. Compl., Doc. 61, #1172). Moreover, as discussed in more detail below, Kramer does identify some representative claims with sufficient particularity as to some Defendants. For these reasons, the Court does not consider whether the *Prather* exception might be an alternative avenue to liability for any Defendant here.

The parties do not dispute *that* the presentment requirement applies in this case. But they do dispute, at least implicitly, *how* the presentment requirement applies to multi-defendant cases such as this one. For example, the CDC Defendants argue that dismissal of Kramer's claims against Doyle and five of the seven corporate CDC Defendants is warranted because Kramer fails to tie those Defendants to an identified representative false claim. (CDC Mot., Doc. 48, #555–56). By contrast, Kramer argues that he need only identify a single representative claim in order to allege the entire scheme as to all Defendants. (Opp'n, Doc. 54, #644).

Thus, before turning to the sufficiency of the allegations against each Defendant here, the Court must confront a pure question of law. In a multi-defendant FCA case, must a plaintiff identify a representative claim submitted, or caused to be submitted, by *each* defendant in order to state a claim against that defendant? Or is it enough to identify a representative claim submitted, or caused to be submitted, by some, but not all, defendants, and then allege that the remaining defendants were part of the fraudulent scheme, without tying them to the identified representative claim?

To the Court's knowledge, neither the Sixth Circuit nor any district court in this circuit has explicitly addressed this issue thus framed. Still, there is considerable case law on the pleading standards applicable in FCA cases more generally, and the Court finds that precedent instructive here. Based on binding Sixth Circuit case law, the Court concludes that to state a claim against a given defendant, a complaint must identify a specific false claim submitted, or caused to be submitted, by *that* defendant.

15

In other words, a complaint that identifies one or more representative claims with sufficient particularity, but then connects only some, but not all, of the defendants to those identified claims, fails to state a claim against the defendants whose connection to the identified claims it has not adequately pled.

That is not to say that the particular defendant him, her, or itself must have actually presented the identified claim. Rather, it is enough if that defendant has a causal link to the submission of the claim. Thus, for example, if a business owner uses his managerial authority to *cause* a claim to be submitted, the owner may be on the hook under the FCA. Conversely, though, identifying a claim that one entity submitted would not suffice to state an FCA claim against another affiliated entity on the theory that the latter entity was under common operational control, and thus likely submitted false claims, as well.

The Court finds such a claim-by-claim, rather than complaint-by-complaint, approach to the presentment requirement more compatible with Sixth Circuit case law. For one thing, as discussed above, the Sixth Circuit has repeatedly emphasized that Rule 9(b) prohibits group pleading in complaints alleging fraud. *See, e.g.*, *Bledsoe I*, 342 F.3d at 643. Put another way, a plaintiff may not rely on allegations of fraud that lump all defendants together, without separately explaining each defendant's role in the alleged fraudulent conduct. *See Sugarlips*, 2022 WL 210135, at *10. The Sixth Circuit has emphasized that at least part of the rationale for the rule against group pleading is that each defendant is entitled to notice of the specific fraudulent conduct in which the plaintiff alleges that he individually engaged. *Bledsoe I*, 342

16

F.3d at 643. Thus, the presence of allegations in a complaint that are adequately pled as to some defendants does not lower the bar to state a claim against the remaining defendants. *Cf. Bledsoe II*, 501 F.3d at 510 ("[I]mproperly pled allegations of fraud do not become adequate merely by placing them in the same complaint with allegations that are sufficient ….").

To be sure, bootstrapping additional defendants onto identified claims whose submission those defendants did not cause might not be group pleading in the narrowest sense, at least insofar as a plaintiff also alleges the role that those additional defendants played in the fraudulent scheme more generally. But the Court finds that the rule against group pleading logically extends to the applicability of the presentment requirement to each defendant in a multi-defendant case. The Court sees nothing in the case law to indicate that what it takes to state a claim against a given defendant in an FCA case should depend on how many other defendants a complaint also names. To the contrary, the Sixth Circuit has repeatedly said the opposite—Rule 9(b) requires plaintiffs to allege fraud with particularity on a defendant-by-defendant basis, and not generally as to all defendants. *See Bledsoe I*, 342 F.3d at 643; *Bledsoe II*, 501 F.3d at 510. In the same vein, the Sixth Circuit has stated that a plaintiff who alleges that a defendant submitted or caused submission of false claims must "identify the entire chain—from start to finish" that connects the defendant to an identified representative claim. *Ibanez*, 874 F.3d at 914. The case law contains no suggestion that this requirement is diminished where a complaint names more than one defendant. Thus, the Court holds that Rule 9(b) requires a plaintiff to

adequately allege each element of the FCA claim, including identifying a representative claim actually submitted or caused to be submitted by the defendant in question, in order to state a claim against that defendant.

The Court finds further support for its interpretation of the pleading standard for presentment in multi-defendant FCA cases in Sixth Circuit precedent that actually applies the presentment requirement in such contexts. For example, in *Owsley*, the plaintiff alleged that a single third-party medical coding company prepared fraudulent materials used by each of several home-health agencies owned by a common parent. 16 F.4th at 195. However, the plaintiff only provided example claims from the agency where she had worked, not the other sister agencies. *See id.* at 197. The Sixth Circuit determined that dismissal of the claims against the other agencies was appropriate because the plaintiff had not fulfilled the presentment requirement as to those agencies. *Id.*

Thus, in *Owsley*, common ownership and a common connection to the billing company that allegedly facilitated the fraudulent scheme apparently did not substitute for fulfilling the presentment requirement as to each defendant. While this conclusion was arguably dicta, because the Sixth Circuit also found that the plaintiff did not fulfill the presentment requirement with respect to even the home-health agency where she worked, *see id.*, it nevertheless illustrates that the *Owsley* court apparently contemplated full applicability of the presentment requirement to each defendant in a multi-defendant case.[3]

---

[3] Judge Clay's partial dissent in *United States ex rel. Branhan v. Mercy Health System of Southwest Ohio*, 188 F.3d 510 (Table), 1999 WL 618018, at *10 (6th Cir. Aug. 5, 1999),

Kramer's argument to the contrary rests on an unwarranted extension of the notion of a "fraudulent scheme" as a means of satisfying Rule 9(b). To be sure, the Sixth Circuit has said that a plaintiff who adequately identifies a single representative claim may proceed to discovery on "the entire fraudulent scheme." *Bledsoe II*, 501 F.3d at 510. But as explained in more detail below, in context, this holding allows plaintiffs to aggregate false claims of the same kind *submitted by a given defendant*, not to bring in additional defendants without otherwise satisfying the presentment requirement as to those defendants.

In *Bledsoe II*, the plaintiff adequately identified a representative claim in which a hospital added extra diagnosis codes to a patient's principal diagnosis code in order to fraudulently increase the amount of claims submitted for that patient. 501 F.3d at 514–15. The Sixth Circuit held that this single representative false claim was enough for the case to proceed as to all alleged false claims of that kind submitted by the same defendants. *Id.* at 515. In other words, a plaintiff who adequately alleges a representative claim is not limited to seeking relief with respect to only that one identified claim, but may pursue his case against the defendant who submitted the identified claim with respect to similar claims also submitted by that defendant.

---

provides further support for strictly applying the presentment requirement to each defendant in a multi-defendant case. There, despite concluding, contrary to the majority, that the plaintiff had met the presentment requirement as to *one* hospital, he nonetheless agreed that the plaintiff had failed to state a claim on presentment grounds as to the *other* hospitals, all of whom the plaintiff had alleged were under common control and part of the same fraudulent billing scheme. *Id.* Like the *Owsley* court, Judge Clay thus apparently assumed that the presentment requirement applies with full force to each defendant in a multi-defendant case.

Allowing a plaintiff who alleges a fraudulent scheme by a defendant to identify only one or a subset of representative claims submitted by that defendant makes sense. In the absence of such an aggregating principle, many cases alleging false claims would either be miniscule in scope, since they would only pertain to one or a few alleged false claims identified in a complaint, or prohibitively unwieldy, since a plaintiff alleging a vast scheme would have to describe every one of potentially hundreds or thousands of similar false claims before even proceeding to discovery. *See id.* at 509 ("Where the allegations in a relator's complaint are complex and far-reaching, pleading every instance of fraud would be extremely ungainly, if not impossible.") (citation and internal quotation marks omitted). But allowing a plaintiff who identifies a representative claim by one defendant to also pursue other alleged false claims *by that same defendant* is a far cry from saying that a plaintiff need not satisfy the presentment requirement at all with respect to other defendants who did not submit (or cause submission of) the identified claim.

Kramer's view also leaves key questions unanswered. Just how does a plaintiff tie a defendant to an alleged fraudulent scheme, if not by identifying a representative false claim that the defendant in question submitted or caused to be submitted? In *Bledsoe II*, the Sixth Circuit undertook a painstaking claim-by-claim analysis of a range of allegations about different kinds of fraudulent claims, finding the presentment requirement fulfilled as to one of those categories (or "schemes"), but not the others. For example, the presentment requirement was met as to a scheme involving adding diagnosis codes, as discussed above, but was not met as to a scheme

20

involving unnecessary glucometer and heel sticks. 501 F.3d at 512, 514. Thus, even in the context of a single defendant, the Sixth Circuit limited the scope of a "fraudulent scheme" to include only alleged false claims sufficiently like the identified claim at issue. *See id.* at 510 ("We conclude that the concept of a fraudulent scheme should be construed as narrowly as is necessary to protect the policies promoted by Rule 9(b)."). More specifically, the Sixth Circuit said that the identified claim must be "representative" of the category of claims that allegedly comprise the fraudulent scheme. *Id.*

If alleging a fraudulent scheme were an avenue for bringing in additional *defendants*, and not only additional false claims by a given defendant, the Court would expect to find some similar limiting principle for determining when a defendant is sufficiently tied to a fraudulent scheme. But Kramer cites, and the Court has found, no precedent that provides any general standard to guide such a determination. In the Court's view, the most likely explanation for that absence is that alleging a fraudulent scheme is not an alternative to fulfilling the presentment requirement as to each defendant in a multi-defendant case, but only a vehicle for aggregating false claims made by a given defendant.

In reaching this result, the Court acknowledges it is perhaps reading too much into *Owsley's* tea leaves. One could imagine, for example, an alternative approach where a plaintiff need only identify one or more representative claims by a given defendant, coupled with allegations that show it was likely that the other defendants in the "scheme" themselves submitted similar claims. For example, imagine a single

owner of five affiliated business entities, all operating in the same field. The owner has a uniform operations manual that it uses for each entity. The plaintiff plausibly alleges that the manual's procedures cause Entity 1 to submit false claims, of which the plaintiff provides one or more representative examples in her complaint. The plaintiff then also alleges that all five entities use the same operations manual, and that they submit claims, but the plaintiff does not allege any representative claims submitted by the remaining entities. The Court could conceive of pleading rules where such allegations would suffice to state a plausible claim against all five entities. But the Court declines to adopt that rule here, largely because that approach appears to the Court inconsistent with both (1) *Owsley*, which seems to require allegations tying each defendant to the submission of one or more representative false claims identified in the complaint, and (2) the Sixth Circuit's admonition to construe "the concept of a fraudulent scheme" "as narrowly as is necessary to protect the policies promoted by Rule 9(b)." *Bledsoe II*, 501 F.3d at 510.

Based on that understanding, the Court will proceed on a defendant-by-defendant basis, in each case asking whether Kramer adequately alleges that that defendant has submitted, or caused to be submitted, a false claim that Kramer has identified with sufficient particularity. The Court finds that Kramer has met this requirement with respect to two of the seven corporate CDC Defendants, but not with respect to Doyle, the other five corporate CDC Defendants, or the NADG Defendants.

A.     **The Third Amended Complaint States A Claim Against CDC Martins Ferry.**

The Court begins with the dental practice that Kramer alleges submitted false claims for five patients whom Kramer himself subsequently treated, CDC Martins Ferry. As discussed in more detail above, Kramer alleges that CDC Martins Ferry conducted medically unnecessary or unlicensed dental procedures on Patients One, Three, Five, Six, and Seven, all Medicaid beneficiaries, and submitted claims for those procedures to Medicaid. For Patient One only, Kramer also provides exact service dates, billing codes, and amounts for the alleged false claims. For the reasons that follow, these allegations suffice to state FCA claims for both submission of a false claim and false statement against CDC Martins Ferry.

1.     **The Third Amended Complaint Adequately Alleges Submission Of False Claims By CDC Martins Ferry.**

Anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" to the United States government has violated the FCA. *See* 31 U.S.C. § 3729(a)(1)(A). Under the "implied certification" theory of liability, a claim may be "false or fraudulent" if it "makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 181 (2016). However, "[a] misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." *Id.*

Here, Kramer's detailed allegations that CDC Martins Ferry performed medically unnecessary and unlicensed procedures on Patients One, Three, Five, Six, and Seven, combined with his identification of service dates, billing codes, and amounts paid for Patient One, suffice to state a claim for submission of a false claim to the Ohio Medicaid program under an implied certification theory. The Third Amended Complaint alleges that Kramer personally examined the patients who received these procedures at CDC Martins Ferry and learned facts about each that support not only a general absence of medical necessity, but also failure to conform to the specific requirements for root canals as indicated in the Provider Service Agreement and Ohio Administrative Code. For example, the Third Amended Complaint alleges that some Medicaid patients had no pain or infection and that CDC Martins Ferry failed to conduct x-rays or collect other documentation as required before proceeding with a root canal. (*See, e.g.*, Third Am. Compl., Doc. 37, #475, 489). The Third Amended Complaint further alleges that non-dentists performed procedures on Medicaid patients, such as cutting into teeth, that only dentists were to perform under Ohio law. (*See id.* at #501). Notably, for Patient One, the Third Amended Complaint also identifies the date of service submitted to the Ohio Medicaid program for each procedure at issue, the amount of reimbursement, and the billing code. (*Id.* at #481–82).

Together, these allegations state that CDC Martins Ferry submitted Ohio Medicaid claims for root canals and other dental procedures that concealed violations of statutory, regulatory, and contractual requirements. These requirements included

Ohio Medicaid's medical necessity requirement reflected in the Service Provider Agreement, the specific documentation and symptom requirements of the Ohio Administrative Code, and Ohio's dental licensure requirements. *See* Ohio Admin. Code 5160-5-01(F)(1). It is plausible that all of these requirements are material to the government's payment decision regarding claims submitted for dental services. *See, e.g.*, *United States v. Bertram*, 900 F.3d 743, 749 (6th Cir. 2018) (lack of medical necessity of urinalysis tests material); *United States ex rel. Doe v. Heart Solution, PC*, 923 F.3d 308, 317 (3d Cir. 2019) (lack of licensure to perform neurological test material). Kramer also identifies specific false claims by date, billing code, and amount paid for Patient One, thus satisfying the requirement to identify "a representative false claim that was actually submitted to the government." *See* *Chesbrough*, 655 F.3d at 470. To be sure, at an appropriate stage of this litigation, CDC Martins Ferry might be able to show that it did comply with the requirements at issue, that its noncompliance was not material, or that it did not submit the claims Kramer alleges. If so, then summary judgment might be appropriate. For purposes of a motion to dismiss, however, Kramer's allegations against CDC Martins Ferry suffice to state a claim.

The CDC Defendants urge a different result, arguing that Kramer's allegations amount to mere disagreement with the dental treatments that CDC Martins Ferry offered, which is insufficient to support a claim for violation of the FCA. (*See* CDC Mot., Doc. 48, #556–57). But the Third Amended Complaint alleges more than a mere difference of opinion. For one thing, it alleges that CDC Martins Ferry violated Ohio

25

Medicaid's express requirements by performing root canals and other dental procedures without x-rays or other documentation showing their medical necessity, in the absence of pain, infection, or trauma to the tooth, and with non-dentists performing tasks only a licensed dentist may perform under Ohio law. (*See* Third Am. Compl., Doc. 37, #466–68). Thus, Kramer does not merely allege that CDC Martins Ferry performed shoddy work, but rather that it billed Ohio Medicaid for work that did not materially comply with that program's express requirements.

Moreover, as the Sixth Circuit has recently stated, "opinions may trigger liability for fraud when they are not honestly held by their maker, or when the speaker knows of facts that are fundamentally incompatible with his opinion." *United States v. Paulus*, 894 F.3d 267, 275 (6th Cir. 2018). The Third Amended Complaint plausibly alleges that CDC Martins Ferry submitted claims for dental procedures that the performing dentist did not honestly believe were medically necessary, or at the very least in spite of the employee's knowledge of facts that were fundamentally incompatible with the medical necessity of those procedures. For example, it is plausible that the CDC Martins Ferry's treating dentists knew that patients whose teeth were free of pain, infection, or trauma did not need root canals. (*See* Third Am. Compl., Doc. 37, #475, 489). Again, if Kramer cannot ultimately prove such knowledge, then summary judgment may be appropriate. But the Third Amended Complaint adequately alleges, at the pleading stage, knowing submission of a false claim by CDC Martins Ferry. *See* Fed. R. Civ. P. 9(b) (knowledge may be alleged generally). Accordingly, the Court **DENIES** the CDC Defendants' Motion to Dismiss

(Doc. 48) Kramer's Third Amended Complaint (Doc. 37) with respect to Kramer's claim for submission of false claims against CDC Martins Ferry.

### 2. The Third Amended Complaint Adequately Alleges False Statements By CDC Martins Ferry.

Separately, a person violates the FCA if he or she "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). For many of the same reasons discussed above, Kramer states a claim against CDC Martins Ferry for violation of this statutory provision under an implied certification theory. Kramer plausibly alleges that, in submitting the indicated claims for Patients One, Three, Five, Six, and Seven to the Ohio Medicaid program, CDC Martins Ferry impliedly certified, for example, that the dental procedures at issue were medically necessary, supported by appropriate documentation, and performed by licensed professionals. The CDC Defendants' argument against this conclusion is that Kramer has failed to allege that any violations of statutory, regulatory, or contractual requirements of the Ohio Medicaid program were material. (*See* CDC Mot., Doc. 48, #560). At this stage, though, that argument fails for the reasons discussed above. *See Bertram*, 900 F.3d at 749; *Doe*, 923 F.3d at 317. Accordingly, the Court **DENIES** the CDC Defendants' Motion to Dismiss (Doc. 48) Kramer's Third Amended Complaint (Doc. 37) with respect to Kramer's claim for false statement against CDC Martins Ferry.

**B.      The Third Amended Complaint States A Claim Against CDC Steubenville.**

As in the case of CDC Martins Ferry, Kramer alleges that he personally treated one former patient of CDC Steubenville, namely Patient Two. (*See* Third Am. Compl., Doc. 37, #483–85). And Kramer's allegations about dental procedures performed on Patient Two are similar to his allegations about the five former patients of CDC Martins Ferry. Specifically, Kramer alleges that CDC Steubenville performed, and billed Ohio Medicaid for, "poor quality" root canals on four "grossly decayed" teeth, teeth numbers 7–10, that required extraction anyway. (*Id.* at #484, 485). Thus, Kramer alleges that the dental procedures at issue did not conform to Ohio Medicaid's reimbursement criteria, which require that a procedure "[m]eets generally accepted standards of medical practice," "[i]s the lowest cost alternative that effectively addresses and treats the medical problem," and is "[n]ot provided primarily for the economic benefit of the provider." *See* Ohio Admin. Code 5160-1-01(C). Much like the allegations regarding procedures performed by CDC Martins Ferry discussed above, these alleged shortcomings are plausibly material for purposes of both 31 U.S.C. §§ 3729(a)(1)(A) and (B). *See Bertram*, 900 F.3d at 749; *Doe*, 923 F.3d at 317.

Moreover, Kramer also identifies the representative false claims with respect to Patient Two with sufficient specificity. While Kramer does not allege the exact date on which CDC Steubenville performed the dental procedures at issue on Patient Two, instead stating only that they happened in "winter 2017/2018" (*id.* at #483), Kramer does describe Ohio Medicaid claims for root canals on four "grossly decayed" teeth, teeth numbers 7–10, and provides a total amount of $990.52 for the alleged false

claims. (*See id.* at #484). That is enough detail to enable CDC Steubenville "reasonably to pluck out" these claims "from all the other claims [it] submitted." *See Owsley*, 16 F.4th at 197. Accordingly, the Court **DENIES** the CDC Defendants' Motion to Dismiss (Doc. 48) Kramer's Third Amended Complaint (Doc. 37) with respect to Kramer's claims for both submission of a false claim and false statement against CDC Steubenville.

## C.   The Third Amended Complaint Fails To State A Claim Against The Other CDC Defendants.

Unlike the case with CDC Martins Ferry and CDC Steubenville, the Third Amended Complaint does not allege that Kramer treated patients who received root canals or other dental procedures at any of the other five corporate CDC Defendants. Nor does Kramer point to any other information suggesting that any specific claim for reimbursement that those other CDC Defendants submitted was false. Nor does the Third Amended Complaint specifically allege how Doyle himself was involved in the allegedly false claims that Kramer identifies CDC Martins Ferry and CDC Steubenville as having submitted. Rather, Kramer seeks to paint with a broad brush. He essentially alleges that, because Doyle was the owner and operator of the various CDC sites, it is plausible to assume that if dentists at one or more CDC sites were submitting false claims, so were dentists at the other CDC sites. For the reasons previewed above, and further discussed below, the Court concludes that this amounts to a form of "group pleading" that Rule 9(b) prohibits.

29

1.  **The Third Amended Complaint Fails To Allege A False Claim Or False Statement By Doyle.**

The Third Amended Complaint fails to allege that Doyle submitted or caused submission of any specific false claim to the Ohio Medicaid program. As noted, Kramer alleges facts generally showing that CDC Martins Ferry and CDC Steubenville submitted false claims. He then alleges that Doyle owned and "mentored" the CDC entities and was responsible for the "shared practices, procedures, and financial goals" that allegedly encouraged submission of false claims, including sometimes calling employees on the phone if they failed to make their revenue targets. (*See* Third Am. Compl., Doc. 37, #449, 491). But the problem is that Kramer does not tie these broad oversight allegations to any specific false claim or statement identified in the Third Amended Complaint. For example, as to the CDC Martins Ferry and CDC Steubenville claims discussed above, Kramer does not allege that Doyle treated those patients, submitted those claims, or indeed played any role in them or even knew about them. *See Branhan*, 1999 WL 618018, at *10 (Clay, J., concurring in part) (plaintiff did not adequately plead parent company's connection to fraudulent claims submitted by one subsidiary); *Ibanez*, 874 F.3d at 915 (affirming dismissal of FCA claim involving alleged complex scheme for failure to "cover the ground from one end of this scheme … to the other" with respect to identified claim).

True, the FCA applies to individual defendants who "cause" submission of false claims even if they were not personally involved in submitting the claims at issue. *See, e.g.*, *United States v. SouthEast Eye Specialists, PLLC*, No. 3:17-cv-00689, 2021 WL 5150687, at *15 (M.D. Tenn. Nov. 5, 2021). But liability under the FCA still

requires "some action by the defendant whereby the claim is presented or caused to be presented." *United States v. Murphy*, 937 F.2d 1032, 1039 (6th Cir. 1991). While the Sixth Circuit apparently has not addressed the precise causation standard that applies, other circuit courts have held that the FCA requires "proximate causation." *See Ruckh v. Salus Rehab., LLC*, 963 F.3d 1089, 1106–07 (11th Cir. 2021); *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 714–15 (10th Cir. 2006), *abrogated on other grounds by Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507 (2019); *see also United States v. Luce*, 873 F.3d 999, 1012 (7th Cir. 2017) (FCA damages provision requires proximate causation); *United States v. Miller*, 645 F.2d 473, 475–76 (5th Cir. 1981) (same); *United States v. Hibbs*, 568 F.2d 347, 354 (3d Cir. 1977) (same). Specifically, "a defendant's conduct may be found to have caused the submission of a claim for [Medicaid] reimbursement if the conduct was (1) a substantial factor in inducing providers to submit claims for reimbursement, and (2) if the submission of claims for reimbursement was reasonably foreseeable or anticipated as a natural consequence of defendants' conduct." *Ruckh*, 963 F.3d at 1107.

Considered under these principles, the Third Amended Complaint's allegations against Doyle on the causation front are too general and conclusory to state with particularity that Doyle proximately caused the submission of any of the identified false claims by CDC Martins Ferry or CDC Steubenville. In other words, the Third Amended Complaint fails to identify the "who, what, when, where, and how" of

Doyle's role in the submission of any identified false claim. *See Sanderson*, 447 F.3d at 877.

The Third Amended Complaint's apparent theory of causation is that Doyle set "financial goals" for the practices (Doc. 37, #449) and sometimes pursued those financial goals by making phone calls to employees who did not meet them (*id.* at #491). But Kramer fails to provide any detail that would connect those general goals and practices to the representative false claims the Third Amended Complaint identifies. *Cf. United States v. Anesthesia Servs. Assocs., PLLC*, Case No. 3:16-cv-0549, 2019 WL 7372511, at *7–8 (M.D. Tenn. Dec. 31, 2019) (broad allegations that individual doctor in managerial role "pressured" providers to increase revenue failed to state claim). Kramer does not allege, for example, that any employee who treated one of the example patients ever received a phone call from Doyle about revenue, nor does he provide even approximate timing, content, or participants in any specific phone call. Kramer also provides no specifics about how or when Doyle personally set or communicated pertinent revenue targets to employees. Nor does Kramer allege that Doyle instructed employees to provide unnecessary or unlicensed services or created incentives tied to providing specific services. *Cf. United States ex rel. Norris v. Anderson*, 271 F. Supp. 3d 950, 955 (6th Cir. 2017) (doctor told staff to use fraudulently high billing code); *SouthEast Eye*, 2021 WL 5150687, at *15 (identified optometrists received financial inducements tied to specific referrals in kickback scheme). Without something along those lines, the Third Amended Complaint fails to

allege with particularity that Doyle individually caused submission of an identified false claim to the Ohio Medicaid program.

To the extent Kramer instead is relying on some kind of veil-piercing theory to reach Doyle, that fails, as well. To start, Kramer does not mention veil-piercing by name, either in the Third Amended Complaint or in his briefing. But more to the point, the Third Amended Complaint fails to make the kinds of allegations that would support Doyle's liability on a veil-piercing theory. For example, Kramer does not allege facts suggesting that Doyle ignored or misused the corporate form. *See United States v. Dynamic Visions, Inc.*, 220 F. Supp. 3d 16, 25 (D.D.C. 2016) ("In determining whether to pierce the corporate veil, the Court asks: (1) is there such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist?; and (2) if the acts are treated as those of the corporation alone, will an inequitable result follow?").

In short, the allegations against Doyle do not sufficiently connect him to any identified false claim to support liability. Likewise, Kramer identifies no specific false statements *by Doyle himself* in connection with any of his example patients or in any other connection. Thus, the Third Amended Complaint also fails to state a claim against Doyle for false statement in violation of 31 U.S.C. § 3729(a)(1)(B).

Because the Third Amended Complaint does not allege facts that state with particularity that Doyle was responsible for any false claim or false statement, the Court **GRANTS** the CDC Defendants' Motion to Dismiss (Doc. 48) the Third Amended Complaint (Doc. 37) with respect to Doyle.

**2. The Third Amended Complaint Fails To Identify Any Specific False Claim By CDC Calcutta, CDC Champion Heights, CDC Dennison, CDC Newcomerstown, Or CDC Shadyside.**

As discussed above, a plaintiff alleging a fraudulent scheme to submit false claims in violation of the FCA must identify at least one representative claim for payment that was actually submitted to the government, and that is somehow attributable to the defendant. *Chesbrough*, 655 F.3d at 470. Kramer fails to do this for the five corporate CDC Defendants other than CDC Martins Ferry and CDC Steubenville. That is fatal to his claims against those Defendants.

Again, Kramer argues that he need not allege a false claim by each corporate CDC Defendant because he is alleging a fraudulent scheme involving all of them. (*See* Opp'n, Doc. 54, #644). But, as discussed in more detail above, the Court determines that alleging a fraudulent scheme is only a way of aggregating false claims of the same kind submitted by the same defendant, not a vehicle for bringing in additional defendants with respect to whom a plaintiff otherwise fails to identify a specific claim. Accordingly, the Court holds that Kramer fails to state a claim for violation of 31 U.S.C. § 3729(a)(1)(A) against the corporate CDC Defendants other than CDC Martins Ferry and CDC Steubenville.

Moreover, even if a plaintiff could satisfy Rule 9(b)'s pleading requirement by identifying a false claim by one entity, and then alleging facts sufficient to show that other affiliated entities likely made similar false claims (e.g., because of common operational rules among the entities), the Court concludes that Kramer has failed to provide such allegations here. That is, the inference Kramer presumably would want the Court to draw is that Doyle caused the false claims to be submitted at CDC

Martins Ferry and CDC Steubenville, and thus it is plausible to conclude that he likewise caused false claims to be submitted by the other corporate CDC Defendants. As set forth immediately above, though, the Court concludes that Kramer fails to link Doyle to the representative claims the Complaint identifies, meaning in turn that Kramer cannot rely on Doyle as the bridge to connect the other corporate CDC Defendants to those allegedly fraudulent claims.

Accordingly, for both of these reasons, the Court **GRANTS** the CDC Defendants' Motion to Dismiss (Doc. 48) with respect to this claim against those five other corporate CDC Defendants in the Third Amended Complaint (Doc. 37).

For similar reasons, the Third Amended Complaint also fails to state a claim against the five CDC Defendants other than CDC Martins Ferry and CDC Steubenville for false statement in violation of 31 U.S.C. § 3729(a)(1)(B). Kramer does not allege that these entities made any statements with respect to the specific false claims (by CDC Martins Ferry and CDC Steubenville) that Kramer identifies in the Third Amended Complaint. Nor does he identify any other specific false statements by the five other corporate CDC Defendants (in large part, no doubt, because he fails to identify any false claims those five entities submitted). Accordingly, the Court **GRANTS** the CDC Defendants' Motion (Doc. 48) with respect to Kramer's claim for false statement in violation of 31 U.S.C. § 3729(a)(1)(B) in the Third Amended Complaint (Doc. 37) against the five corporate CDC Defendants other than CDC Martins Ferry and CDC Steubenville.

**D.    The Third Amended Complaint Fails To State A Claim Against The NADG Defendants.**

It is undisputed that the NADG Defendants had no business relationship with the CDC Defendants when several of Kramer's example patients received treatment at CDC Martins Ferry or CDC Steubenville. But the Third Amended Complaint alleges that the NADG Defendants did have a business relationship with the CDC Defendants by the time Patients Six and Seven, and perhaps Patient Five, received treatment at CDC Martins Ferry. (*See* Doc. 37, #453, 496, 500, 504). Much as with respect to Doyle, though, the problem is that Kramer fails to allege that the NADG Defendants played any role in the submission of false claims or statements for those patients. For example, Kramer does not allege that the NADG Defendants or their employees actually submitted claims to Ohio Medicaid, either in general or for the example patients mentioned in the Third Amended Complaint. Nor does Kramer allege any act by the NADG Defendants that caused the submission of a specific false claim.

Instead, Kramer refers to the claims for payment as "Complete Dental Care's claims," and only alleges generally that "[b]y virtue of its control over Complete Dental Care's dental practice and its encouragement of Doyle's schemes, North American Dental Group also caused the submission of these false claims." (*Id.* at #502, 506). Kramer attempts to substantiate this "control" by alleging that the NADG Defendants continued the CDC Defendants' allegedly unrealistic revenue targets, kept track of individual dentists' revenue, and rewarded those dentists who met their revenue targets. (*Id.* at #454). But, much as with Doyle, these allegations do not

36

suggest that the NADG Defendants played a role in the submission of false claims, or that they were responsible for any false statements with respect to the alleged false claims, for Patients Five, Six, and Seven specifically, the only relevant patients for whom Kramer identifies specific false claims. *See Ibanez*, 874 F.3d at 915; *Branhan*, 1999 WL 618018, at *10 (Clay, J., concurring in part); *Anesthesia Servs.*, 2019 WL 7372511, at *7–8. Kramer also does not provide any specific facts about how or when the NADG Defendants caused employees of CDC Martins Ferry to perform allegedly unnecessary dental procedures or submit false claims for Patients Five, Six, and Seven.

As in the case of Doyle, Kramer's allegations also fall far short of what would be required to plausibly suggest that Kramer could reach the NADG Defendants on a veil-piercing theory. That is especially true given the Third Amended Complaint's lack of clarity as to whether the NADG Defendants are the "owner" or only the "partner" of the corporate CDC Defendants, as well as its vague allegations that *both* Doyle and the NADG Defendants "control" the corporate CDC Defendants. (*See* Third Am. Compl., Doc. 37, #449, 453, 503). Accordingly, the Court **GRANTS** the NADG Defendants' Motion (Doc. 49) in its entirety, and **DISMISSES** the claims against NADG in the Third Amended Complaint (Doc. 37) **WITH PREJUDICE**.

## E. The Court Denies Kramer's Motion For Leave To Amend Because Further Amendment Would Be Futile.

Because the Court finds that the Third Amended Complaint fails to state a claim against several of the Defendants in this action, the Court also must consider Kramer's Motion for Leave to File Fourth Amended Complaint in lieu of dismissing

Kramer's claims against those Defendants. For the reasons that follow, the Court **DENIES** Kramer's Motion for Leave to File Fourth Amended Complaint (Doc. 57) in its entirety.

At the outset, the Court notes that this would be Kramer's fifth attempt to state a claim against all Defendants in this action. Accordingly, even if the Fourth Amended Complaint did successfully state a claim against some or all of the Defendants as to whom the Third Amended Complaint fails, the Court might still be inclined to deny leave to amend on grounds of "repeated failure to cure deficiencies by previous amendments" and "undue prejudice to the opposing part[ies]." *See Gen. Elec. Co.*, 916 F.2d at 1130. Ultimately, though, the Court need not rely on this rationale, because the Fourth Amended Complaint in any event fails to remedy the deficiencies of the Third Amended Complaint with respect to all Defendants at issue.

### 1. The Proposed Fourth Amended Complaint Would Fail To State A Claim Against Doyle.

The new allegations concerning Doyle in Kramer's Proposed Fourth Amended Complaint do not remedy Kramer's failure to state a claim against Doyle in his Third Amended Complaint. Kramer alleges that a former Complete Dental Care employee who worked at "several" CDC locations, "including Martins Ferry and Shadyside," told him that Doyle often instructs non-dentists to add items to patient treatment plans that the assigned dentist never approved. (*See* Prop. Fourth Am. Compl., Mot. to Amend Ex. B, Doc. 57-2 #1092–95). To be sure, these allegations may substantiate a greater role for Doyle in the alleged provision of unnecessary dental services by other dentists than was apparent from Kramer's Third Amended Complaint. But they

do not get Kramer across the finish line because they still fail to tie Doyle to any specific false claim that the Proposed Fourth Amended Complaint identifies. As noted, a *qui tam* plaintiff must identify a claim representing the allegedly fraudulent conduct with sufficient specificity to allow defendant "reasonably to pluck out" that claim "from all the other claims [he] submitted." *See Owsley*, 16 F.4th at 197. As applicable here, then, Kramer must identify one or more claims in which the alleged changes to treatment plans made at Doyle's instruction led to submission of a false claim.

Measured against that standard, the Proposed Fourth Amended Complaint falls short. For example, it does not allege that Doyle modified the treatment plans for any of the specific example patients Kramer identifies (which modification might then have caused the submission of the identified false claims for those patients to Ohio Medicaid).[4] Nor does it identify any other specific instance in which a Doyle-instructed change resulted in Medicaid being billed *at all*. Accordingly, however troubling Doyle's alleged conduct, Kramer again has failed to tie that conduct to any identified false claim or statement Doyle made or caused to be made to the government. *See Sanderson*, 447 F.3d 877–78 (the FCA "attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the

---

[4] Indeed, the Proposed Fourth Amended Complaint instead alleges that Doyle's practice of changing patient treatment plans did not begin until September 2017, more than two years after the identified claims submitted for Patient One by CDC Martins Ferry. (*See* Doc. 57-2, #1092). Moreover, the Proposed Fourth Amended Complaint does not allege that the employee on whom Kramer relies for the information about Doyle changing treatment plans ever worked at CDC Steubenville, such that she could have observed Doyle changing the treatment plan for Patient Two, the only identified patient who allegedly received improper dental care at that location. (*See id.*).

claim for payment") (citation and internal quotation marks omitted). For these reasons, the Court **DENIES** Kramer's Motion for Leave to File Fourth Amended Complaint (Doc. 57) with respect to Doyle and accordingly **DISMISSES WITH PREJUDICE** all claims against Doyle.

> **2.** **The Proposed Fourth Amended Complaint Would Fail To State A Claim Against CDC Calcutta, CDC Champion Heights, CDC Dennison, CDC Newcomerstown, or CDC Shadyside.**

Kramer's Proposed Fourth Amended Complaint adds no new allegations of specific false claims or statements by corporate CDC Defendants other than CDC Martins Ferry or CDC Steubenville. Thus, for the reasons already discussed above in connection with Kramer's Third Amended Complaint, Kramer's Fourth Amended Complaint still fails to state a claim against these other entities. To wit, the Court interprets Sixth Circuit case law to require allegations of presentment as to each of the corporate CDC Defendants, which Kramer's Proposed Fourth Amended Complaint still fails to provide. Moreover, even if some inference arising from the common ownership or control by Doyle could be a permissible basis for extending FCA liability to the other corporate CDC Defendants, that linchpin is missing here, because the Proposed Fourth Amended Complaint fails to adequately allege Doyle's own connection to the identified false claims, as discussed immediately above. Accordingly, the Court **DENIES** Kramer's Motion for Leave To File Fourth Amended Complaint (Doc. 57) with respect to the five CDC Defendants other than CDC Martins Ferry and CDC Steubenville and **DISMISSES** Kramer's claims against those five CDC Defendants **WITH PREJUDICE**.

### 3. The Proposed Fourth Amended Complaint Would Fail To State A Claim Against the NADG Defendants.

Stated briefly, Kramer's new allegations about the NADG Defendants are that a former employee of NADG's Refresh Dental office in Shaker Heights, Ohio (not otherwise affiliated with Doyle or CDC), told Kramer that the NADG Defendants have sent Doyle to that location to lead an Optimization Team to increase revenue by encouraging medically unnecessary dental procedures. (*See* Prop. Fourth Am. Compl., Mot. to Amend Ex. B, Doc. 57-2, #1095–98). These new allegations, which do not concern the scheme in which all Defendants are allegedly participating together, do not remedy the deficiencies in Kramer's Third Amended Complaint as to the NADG Defendants. Kramer's new allegations do nothing to tie the NADG Defendants to the specific false claims for dental treatment that Kramer alleges CDC Martins Ferry and CDC Steubenville submitted to Ohio Medicaid, which are still the only specific alleged false claims Kramer identifies. *See Chesbrough*, 655 F.3d at 470; *Ibanez*, 874 F.3d at 915. Accordingly, the Court **DENIES** Kramer's Motion for Leave to File Fourth Amended Complaint (Doc. 57) with respect to the NADG Defendants and therefore **DISMISSES** Kramer's claims against the NADG Defendants **WITH PREJUDICE.**

### F. The NADG Defendants' Partially Unopposed Motion For Leave To File Surreply, Instanter, Is Moot.

Because the Court denies Kramer's Motion for Leave to File Fourth Amended Complaint (Doc. 57) in its entirety, the Court also **DENIES AS MOOT** the NADG

Defendants' Partially Unopposed Motion for Leave to File Surreply Brief, Instanter (Doc. 62).

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the CDC Defendants' Motion to Dismiss (Doc. 48). Specifically, the Court **DENIES** the Motion (Doc. 48) with respect to all claims against CDC Martins Ferry and CDC Steubenville. The Court **GRANTS** the Motion (Doc. 48) in all other respects. Accordingly, the Court **DISMISSES WITH PREJUDICE** all claims against CDC Calcutta, CDC Champion Heights, CDC Dennison, CDC Newcomerstown, CDC Shadyside, and Doyle. The Court also **GRANTS** the NADG Defendants' Motion to Dismiss (Doc. 49) in its entirety, and thereby **DISMISSES WITH PREJUDICE** all claims against the NADG Defendants. The Court **DENIES** Kramer's Motion for Leave to File Fourth Amended Complaint (Doc. 57). The Court therefore also **DENIES AS MOOT** the NADG Defendants' Partially Unopposed Motion for Leave to File Surreply Brief, Instanter (Doc. 62). The Court **DIRECTS** the Clerk to **TERMINATE** Doyle, CDC Calcutta, CDC Champion Heights, CDC Dennison, CDC Newcomerstown, CDC Shadyside, and the NADG Defendants from this action. This action will proceed as to all claims against CDC Martins Ferry and CDC Steubenville.

**SO ORDERED.**

April 21, 2022
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**